## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 15 2016, 8:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Raymond P. Dudlo
Bamberger, Foreman, Oswald, and Hahn, LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

K.S., I.S., D.S., S.S., M.S., and G.S., (Minor Children)

Children in Need of Services and

T.S. (Mother) and J.S. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

September 15, 2016

Court of Appeals Case No. 26A01-1601-JC-241

Appeal from the Gibson Circuit Court

The Honorable Jeffrey F. Meade, Judge

Trial Court Cause Nos.
26C01-1508-JC-165
26C01-1508-JC-166
26C01-1508-JC-167
26C01-1508-JC-168
26C01-1508-JC-169
26C01-1508-JC-170

**Bailey, Judge.**

# Case Summary

T.S. ("Mother") and J.S. ("Father") (collectively, "Parents") appeal the trial court's order adjudicating K.S., I.S., D.S., S.S., M.S., and G.S. ("Children") as Children in Need of Services ("CHINS"), upon the petition of the Gibson County Department of Child Services ("DCS"). Parents present a single, consolidated issue: whether the trial court's findings of fact and conclusions thereon are clearly erroneous. We reverse.

# Facts and Procedural History

In January of 2015, DCS received a report that M.S. had been hospitalized and diagnosed with failure to thrive. DCS caseworkers went to the home shared by Parents and their six children and found it to be "in disarray," with piles of dirty diapers, spoiled food on dishes, vomit covered by a towel, and a lingering odor. (Tr. at 24.) The caseworkers had "safe sleep" concerns because G.S., an infant, was covered with a heavy blanket. (Tr. at 24.)

DCS and Parents entered into an informal adjustment, and DCS provided a parent aide for the months of January 2015 through June 2015. By June, there "were still several concerns," including feces embedded in carpet. (Tr. at 26.) DCS decided to provide a Home Builders representative five days per week. The home was organized, decluttered, and cleaned; services were concluded on July 27, 2015.

[4]     On August 20, 2015, family case manager Brittany Culp ("FCM Culp") made an unannounced visit to the home. FCM Culp observed dishes with spoiled food on the counter. She went into the boys' bedroom and found M.S. "covered in loose feces," as was his "Pack n Play." (Tr. at 30.) A second FCM was present, and discovered G.S. soaked in urine. There were soiled diapers on the floor and feces on the wall. Both G.S. and M.S. had severe diaper rash. In the girls' room, there were bowls of old ramen noodles. In the laundry room, clothing was piled in a cat litter box. FCM Culp, two other case managers, and law enforcement officers removed Children from the home.

[5]     On August 24, 2015, DCS requested authorization to file a Verified Petition Alleging that Children were CHINS. DCS alleged that Children needed the coercive intervention of the court due to the conditions of the home and further alleged that DCS representatives had observed Children to be suffering from significant developmental delays. DCS's request for authorization was granted on the same day and Children continued in placement outside Parents' home. Parents were not court-ordered to participate in services, but did so voluntarily.

[6]     A fact-finding hearing was conducted on November 30, 2015. On December 29, 2015, the trial court entered findings of fact and conclusions thereon, and adjudicated Children to be CHINS. Parents now appeal.

# Discussion and Decision

# Standard of Review

[7] A CHINS proceeding is a civil action, and thus the State must prove by a preponderance of the evidence that a child is a CHINS. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010) (citing Ind. Code § 31-34-12-3). In reviewing a CHINS adjudication, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). We consider only the evidence that supports the court's decision and the reasonable inferences drawn therefrom. *Id.* We will reverse only upon a showing that the trial court's decision was clearly erroneous. *Id.*

[8] In this case, the trial court *sua sponte* entered findings of fact and conclusions thereon,[1] and thus our review is governed by Indiana Trial Rule 52(A). *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). As to issues covered by the findings, we apply a two-tiered standard of review: first we consider whether the evidence supports the factual findings, and then whether those findings support the court's judgment. *Id.* We review the remaining issues under the general judgment standard where we will affirm the judgment if it can be sustained on any legal theory supported by the evidence. *Id.*

---

[1] The CHINS statutes do not require that findings of fact and conclusions thereon be entered as part of a CHINS fact-finding order. Here, neither party made a written request for Trial Rule 52 findings and conclusions.

## Adjudication of Children as CHINS

[9] For the trial court to adjudicate a child a CHINS, DCS must prove three elements: (1) the child is under the age of eighteen; (2) one of eleven statutory circumstances (codified in Indiana Code sections 31-34-1-1 to -11) exist that would make the child a CHINS; and (3) the child needs care, treatment, or rehabilitation that he or she is not receiving and that is unlikely to be provided or accepted without the coercive intervention of the court. *In re K.D.*, 962 N.E.2d at 1253 (citing *In re. N.E.*, 919 N.E.2d at 105). DCS alleged that Children were CHINS under Section 31-34-1-1, the general neglect provision, which states:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

I.C. § 31-34-1-1.

[10] Not every endangered child is a CHINS, permitting the State's *parens patriae* intrusion into private family life. *In re S.D.*, 2 N.E.3d at 1287. The proper focus is upon the best interests of the child and whether the child needs help that the parent will not be willing or able to provide – not whether the parent is guilty or deserving of a CHINS adjudication. *Id.* at 1285.

[11] A CHINS adjudication under the general neglect provision "requires three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *Id.* at 1287. The coercive intervention prong exists to protect families from unnecessary state intrusion. *Id.* A CHINS finding should consider the family's condition when the case was filed, but also when the case is heard. *Id.* at 1290.

## *Findings of Fact*

[12] Parents contend that DCS failed to show that Children's needs are unlikely to be met without State coercion.

[13] The trial court entered findings of fact regarding the birth dates of Children, the informal adjustment, the conditions of the home on August 20, 2015, the removal, and the procedural history. As for findings of fact based upon the testimony presented at the fact-finding hearing, the trial court found that Parents had expressed a preference for "unschooling," Children exhibited developmental delays, a "parenting stress index" revealed low scores, and "decisions made by the parents indicate that they are either unwilling or unable

to sustain a safe and sanitary environment or provide consistent, attentive supervision and care for the children." (App. at 42-43.)

[14] The court entered the following conclusions:

> 3. The Court finds that DCS has proven by a preponderance of the evidence the following pursuant to I.C. § 31-34-1-1:

> a. The children's mental or physical health is seriously impaired or seriously endangered as the result of the inability, refusal, or neglect of the parents to provide the children with necessary supervision.

> b. The children are in need of care, treatment, or rehabilitation which the children are not receiving and are unlikely to receive without the coercive intervention of the Court.

(App. at 44.)

[15] As the State observes, Parents do not – for the most part – dispute the accuracy of the factual findings. Parents concede that they did not place Children (all of whom were under age seven when removed) in public schools. Mother had made reference to "unschooling," a method relying heavily upon field trips and specific requests from a child to be taught something. (Tr. at 217.) Moreover, Parents do not contest the fact that they participated in testing administered by Art Therapist Anna Durbin ("Durbin"), and that Durbin testified that she concluded each parent had essentially the same "maladaptive behaviors" such

as spousal over-dependence, a preference for being alone, sleep difficulties, anxiety, and a lack of interest in life activities. (Tr. at 152.)[2]

[16] In short, Parents do not dispute the fact that their home was unsanitary and in disarray at the time of Children's removal. Nor do they challenge findings that subsequent testing has revealed some child developmental delays or parental stressors. Rather, they argue that they cooperated fully with DCS services to address concerns, even without a court order, and have remedied each condition identified to them. They maintain that the State did not establish the critical element for a CHINS adjudication, that is, "needs unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287. They claim that this case is analogous to *In re S.D.*, wherein our Indiana Supreme Court concluded in relevant part: "S.D. and her sibling were legitimately in need of services when DCS filed its petitions. But by the fact-finding hearing, Mother had voluntarily

---

[2] Parents strenuously objected, without success, to the admission of Durbin's mental health opinion testimony. Durbin testified that she is not a licensed social worker and holds a master's degree in art therapy. She testified that her home-based services employer had taught her to administer a test she called "parenting stress index" and "the results are then overlooked [sic] by a licensed clinical social worker" who "writes the report" that Durbin "drew from." (Tr. at 137.) According to Durbin, someone she identified as Shirley Pryer "wrote what the interpretation of it was" and then Durbin had "the quotes from her report of what she said, and then what the report says in certain criteria, certain scoring elements." (Tr. at 139.) As described by Durbin: "The report has different recommendations like if these are the scores, it says these things are possible." (Tr, at 139.)

When the trial court inquired whether the "PSI" is "a full-blown psych evaluation," Durbin responded that she was "unsure." (Tr. at 140.) She explained: "I've never done a psych eval. I do parenting stress index. I do the safe assessment with clients and the Vineland Adaptive Assessment. I also do the substance abuse assessment as well. It just depends on the referral, what things are included in that." (Tr. at 140.) The trial court then sustained Parents' hearsay objection and struck the parenting stress index report from evidence. Nonetheless, Durbin was permitted to testify as to the results of the Vineland Adaptive Assessment, which she "did score" personally. (Tr. at 145.) It concerns adaptive or mal-adaptive behaviors.

addressed all but one of those concerns to the trial court's satisfaction." *Id.* at 1290.

[17] Here, the findings are silent on Parent's satisfaction of DCS goals post-removal. However, the record is replete with evidence of parental cooperation. In relevant part, FCM Culp testified:

> Question: Were [Parents] always willing to cooperate with your recommendations on [sic] the service providers?
>
> Culp: Yes, they were.
>
> Question: Did that remain true to this day?
>
> Culp: Yes.

(Tr. at 54.) FCM Culp acknowledged that Parents were "participating in services of their own volition," had made improvements to their home, and had regularly visited with Children (bringing along appropriate supplies). (Tr. at 94.) She testified that Parents agreed to First Steps services for the younger children, had not opposed enrollment of the older siblings in public school, "agreed to use a parent aide," and had cooperated with drug screens despite no indication of illegal drug use by either parent. (Tr. at 99.)

[18] According to FCM Culp, "[Parents] have completed all the services that [DCS] requested," but she also noted that psychological evaluations were not completed by the time of the fact-finding hearing. (Tr. at 113.) She explained that Mother had texted to ask when that would take place. FCM Culp

responded that she didn't know when, but that she had sent the referral. There was no suggestion that any delay was attributable to either parent. Also, FCM Culp acknowledged that Mother had requested a meeting with the DCS educational liaison, but the meeting had not been arranged.

[19] FCM Culp testified that she had not been notified of any concerns arising during parental visits. Lead parenting time supervisor Kirsti Hicks testified that Parents and Children exhibited bonding, Parents posed no danger to Children, and the parent-child interactions during three-hour visits appeared appropriate.

[20] Despite her acknowledgment that Parents were fully cooperative, Parents had "rectified home conditions" obviating danger, and Parents had behaved appropriately during parenting time, FCM Culp insisted that Children should remain out of the home. (Tr. at 110.) This opinion stemmed from her "concern that something may happen." (Tr. at 109.) Ultimately, FCM Culp agreed that Parents "didn't need to change anything they're doing; they need to continue what they're doing." (Tr. at 112.)

[21] In sum, Parents fully cooperated with service providers, participated in appropriate visits with Children, rectified home conditions, and, at times, proactively inquired about other services. In light of the history of parental participation, we hope appropriate services can continue cooperatively as necessary for the benefit of the children and maintenance of the family unit. Regardless, the concerns of DCS personnel, without specific evidentiary foundation, do not justify continued State coercive intrusion into Parents' and

Children's family life. "The intrusion of a CHINS judgment … must be reserved for families who *cannot* meet those needs without coercion—not those who merely have *difficulty* doing so." *In re S.D.*, 2 N.E.3d at 1285 (emphasis in original). Here, the evidence does not establish a critical element for a CHINS adjudication, that is, the need for State coercion.

# Conclusion

[22] The trial court's order, unsupported by evidence that Children's needs are unlikely to be met without State coercion, is clearly erroneous.

[23] Reversed.

Riley, J., concurs.
Barnes, J., dissents with separate opinion.

In the Matter of:
K.S., I.S., D.S., S.S., M.S., and
G.S., (Minor Children),

Children in Need of Services and

T.S. (Mother) and J.S. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner.*

Court of Appeals Cause No.
26A01-1601-JC-241

**Barnes, Judge, dissenting.**

I believe the CHINS petition was appropriate and proved by DCS by a preponderance of the evidence. The services extended here have been plentiful, constant, and needed. I see no realistic hope that the children will receive the services and protection they deserve without "the coercive intervention of the court." Ind. Code § 31-34-1-1. The parents here may have made recent improvements, but the trial court was permitted to consider their history of

failure to maintain such improvements. I cannot say that the trial court's decision was clearly erroneous. The majority's decision to the contrary, I believe, is a reweighing of the evidence. Given the significant deference we give to trial courts in such matters, I would affirm.