# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 04 2019, 10:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT MOTHER

Amanda McIlwain
Legal Aid Corporation of Tippecanoe County
Lafayette, Indiana

ATTORNEY FOR APPELLANT FATHER

Jennifer L. Schrontz
Schrontz Legal Group, LLC
Lafayette, Indiana

ATTORNEYS FOR APPELLEES

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of: M.T. and N.G., Children in Need of Services, <br><br> A.D. (Mother) and D.G. (Father), <br><br> *Appellants-Respondents*, <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner*. | March 4, 2019 <br><br> Court of Appeals Case No. 18A-JC-2280 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Hon. Faith A. Graham, Judge <br> The Hon. Tricia Thompson, Magistrate <br><br> Cause Nos. <br> 79D03-1804-JC-115 <br> 79D03-1804-JC-116 |

**Bradford, Judge.**

# Case Summary

In April of 2018, the Indiana Department of Child Services ("DCS") received a report of poor conditions in the home where A.D. ("Mother") and D.G. ("Father") were living with their child N.G. and M.T., a child Mother had had with another man (collectively, "the Children"). The Children were removed and placed with Father's mother, where M.T., at least initially, exhibited some disturbing behaviors. Over the next few months, Parents exhibited significant progress in achieving and maintaining a suitable home for the Children and complying with ordered services. In July of 2015, a two-day evidentiary hearing was completed, at the beginning of which Parents and DCS indicated that they had agreed that the case should go to an informal adjustment ("IA"). After hearing evidence, the juvenile court declined to approve the IA and adjudicated the Children to be children in need of services ("CHINS"). Parents contend, and DCS concedes, that the juvenile court's adjudication was erroneous. Because we agree with the parties, we reverse and remand with instructions.

# Facts and Procedural History

[2] N.G. was born to Parents on December 3, 2016, and M.T. was born on July 23, 2015, to Mother and W.T.[1]  On April 13, 2018, DCS learned of reports of Parents being impaired and inadequately supervising the Children as well as unsafe home conditions.  When DCS family case manager Lauren Murray ("FCM Murray") visited Parents' Lafayette home later that day, she could hear the Children inside but was unsuccessful in getting an adult to answer the door.  FCM Murray finally gained entry after Mother was contacted and returned from work.  Father was home at the time but claimed to have locked himself in a bathroom because of anxiety and that he did not answer the door because he is hearing-impaired.  In fact, Father had been in a bedroom watching television with headphones on.

[3] FCM Murray observed dirty diapers and trash on the floor and that the kitchen was filed with dirty dishes, the Children's beds were soiled, and the Children did not appear to have bathed recently.  FCM Murray also noticed that the Children were being confined to one bedroom with a baby gate.  When Mother changed the Children's diapers, FCM Murray observed that N.G. had a severe diaper rash which, as it happens, had not been evaluated by a doctor.  DCS removed the Children and placed them with Father's mother.

[4] On April 16, 2018, DCS petitioned to have the Children declared CHINS, alleging, *inter alia*, that the Children were being confined to their bedroom for all but one or two hours a day, Father was the only caregiver on April 13 and

---

[1] W.T. does not participate in this appeal.

was in his bedroom watching television with headphones on, the Children had been left in the same diapers for a prolonged period of time, and the condition of the home was poor. After the Children were removed, DCS referred both Parents to services. DCS referred Mother to individual counseling, a clinical interview and assessment, random drug screens, home-based case management, and visitation. DCS referred Father to a substance-abuse disorder assessment, random drug screens, home-based case management, visitation, and a clinical interview and assessment. Also on April 16, 2018, FCM Kaneez Sayal met with Parents and W.T. and had them screened for drug use; Parents' results were negative while W.T. tested positive for marijuana.

[5] On April 24, 2018, Parents were referred to Jennifer Raderstorf, a parenting-time facilitator at Child and Family Partners, and the first visit occurred on May 14, 2018. Raderstorf supervised two visits with Parents in May of 2018 and did not have any concerns. The case was transferred to Carrie Leak at Child and Family Partners, and Leak first supervised a visit on June 1 or 2, 2018. Leak has supervised three visits with Parents. Two of the three visits occurred in Parents' home, and Leak did not have any safety concerns.

[6] In the third week of May of 2018, FCM Sayal visited Parents' home. FCM Sayal expressed some safety concerns, and Parents said that it would take approximately one week to address them. FCM Sayal visited the home unannounced a week later, and most of the safety concerns had been addressed. The Children, however, still had access to cigarette butts in ashtrays and a curling iron in the bucket under the bathroom sink. In FCM Sayal's view,

Parents had not yet taken full responsibility for confining the Children in their bedroom without adult supervision.

[7] On May 31, 2018, M.T. completed an assessment with Amber Yakima, a therapist at Wabash Valley Alliance. Father's mother had taken M.T. to Wabash Valley, without a referral from DCS, because she had been demonstrating some difficult and aggressive behaviors towards N.G. and herself. Father's mother reported that M.T. was eating feces, smearing it on the walls, and encouraging N.G. to do the same. M.T. would also scratch, bite, choke, and gag herself in an attempt to make herself vomit and have temper tantrums which Father's mother described as "rages." Tr. Vol. II p. 18.

[8] Yakima found M.T.'s behaviors concerning because of "the incongruence with the presentation." Tr. Vol. II p. 18. During the assessment, M.T. had a "very solemn expression[,]" her "eyes were empty[,]" she had a "very flat affect[,]" and she was "expressionless[.]" Tr. Vol. II p. 19. Yakima was also concerned about the following: M.T. had limited interest in engaging with others; she was aggressive with other children; her speech and communication skills were poor; she would eat non-food items like stickers and tape; she would gorge herself on almost every meal to the point where she gagged and almost vomited; she frequently complained about being sick; and it was reported that she had approached a stranger in a grocery store, hugged him, and said "bye, I love you daddy[.]" Tr. Vol. II p. 24. M.T. was also found to have poor coordination and delayed gross-motor skills, she walked on her tiptoes, she could barely feed herself, and she could not drink from a cup. M.T. had also exhibited sexualized

behaviors, including frequently pulling Father's mother's shirt down to expose her breasts and putting her dolls or stuffed animals on top of one another. Yakima recommend therapy for M.T.

[9] The first day of the two-day evidentiary hearing was June 12, 2018. FCM Murray testified that she was concerned about placing the Children back into Parents' care because Parents did not seem to yet understand why the Children had been removed. FCM Murray was also concerned with Parents' statements regarding home conditions and the Children being confined with the baby gate. FCM Murray opined, however, that the issues could be remedied with services. FCM Sayal testified that although service providers initially had difficulty contacting Parents, they had since been in contact and Parents had been actively participating. FCM Sayal did not have any concerns about the Children returning home, with the exception of the therapist's testimony regarding M.T.'s concerning behaviors. FCM Sayal testified that she was recommending an in-home CHINS because Parents had complied with services and had made changes to the home. Following the evidentiary hearing, the juvenile court ordered DCS to arrange for M.T. to receive individual therapy with Yakima, a GLASS evaluation,[2] and a Heartford House interview before Parents' next visit.

---

[2] A GLASS evaluation "assesses a child for either speech delays, motor delays, [or other] things of that sort." Tr. Vol. II p. 153.

[10]     The second day of the evidentiary hearing was held on July 25, 2018.  DCS informed the juvenile court at the beginning of the hearing that it and Parents had agreed to an IA of the case.  The juvenile court, however, indicated that it would need to hear additional evidence before it could approve the IA.  FCM Samantha Goltz testified that Father was fully engaged in random drug screens, individual therapy, case management, and parenting time.  Father had already completed a substance-abuse assessment at Wabash Valley and was participating in therapy there.  Father had also been referred to Wabash Valley for medication management.  Although Father had missed a few drug screens due to being unable to get to the clinic, he had always let FCM Goltz or the home-based case manager know that he missed.  All of Father's drug screens had been negative.  FCM Goltz testified that Mother was fully engaged in parenting time, home-based case management, and random drug screens.  Mother completed a mental-health assessment at Wabash Valley which resulted in a recommendation that she participate in individual therapy as needed.  All of Mother's drug screens had been negative.

[11]     FCM Goltz indicated that Parents were participating in home-based case management through Child and Family Partners.  In home-based case management, Parents have been working on ways to keep the home clean and organized, as well as addressing any safety concerns.  DCS has implemented parenting education as part of home-based case management, so Parents are learning new parenting skills.  Father testified that he finds home-based case management to be helpful and would like to continue.  Parents were continuing

to have parenting time with the Children in their home, and the supervision level had decreased to "drop-in[s.]" Tr. Vol. II p. 100.

[12] M.T. had been referred to Yakima at Wabash Valley for therapy and had participated in the Harford House interview. DCS was also in the process of arranging a GLASS evaluation for M.T. No services had been referred for N.G. As for N.G.'s diaper rash, Mother testified that it had been an issue since N.G. was approximately one month old but that they had been working with her doctor to address it. Parents have switched N.G.'s diapers, wipes, formula, clothing, and clothing detergent to try to prevent the rash from reoccurring but have been unable to determine the cause. FCM Goltz testified that Parents were actively treating it. FCM Goltz opined that any remaining concerns about Parents and their ability to parent the Children could be addressed through an IA.

[13] Court-appointed special advocate Leigh Anne Fricke ("CASA Fricke") testified that Parents' home was appropriate, she did not see any issues with the way Parents interacted with the Children, and she was encouraged by Parents' desire to participate in services. CASA Fricke agreed with FCM Goltz and testified that she did not have any concerns with the case going to an IA.

[14] Parents testified that they had worked on improving the condition of the home, ensuring that it is organized and safe for the Children. Parents had removed the baby gate from the Children's doorway and had put some knives out of their reach. When supervising the Children, Parents keep a close eye on them and can intervene if needed. At the end of the July 25, 2018, factfinding hearing,

DCS renewed its request for an IA. The juvenile court, however, declined to approve the IA, found the Children to be CHINS, and issued an order to that effect on August 6, 2018.

[15] On August 17, 2018, the juvenile court held a dispositional hearing. Mother and Father were continuing to receive services at the time of the dispositional hearing, including case management, parenting education, visitation, and random drug screens. Father was also attending individual therapy and medication management. At that time, Parents had begun overnight visitation with the Children. M.T. was participating in therapy, and Mother set up a GLASS evaluation for her. The Children continued to be placed with Father's mother. FCM Goltz testified that the condition of Parents' home continued to be appropriate and recommended that Parents have a trial home visit with the Children. FCM Goltz opined that Parents would be able to meet the Children's needs if they were placed back into their care. On September 3, 2018, the juvenile court entered its dispositional decree, ordering Father and Mother to participate in various services. Mother's and Father's separate appeals were consolidated by order of this court.

# Discussion and Decision

[16] Indiana Code section 31-34-1-1 provides that a child is a CHINS before the child becomes eighteen years of age if

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the

child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

The Indiana Supreme Court has stated that

> [a] CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the [juvenile] court's decision and reasonable inferences drawn therefrom. *Id*. We reverse only upon a showing that the decision of the [juvenile] court was clearly erroneous. *Id*.

*In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012) (footnote omitted).

Both Parents contend that the juvenile court erroneously found the Children to be CHINS. DCS agrees. As DCS points out, the juvenile court's CHINS order focuses almost entirely on evidence at the time of the Children's removal on April 13, 2018, without accounting for the significant progress Parents have made since. When determining whether a child is a CHINS, the juvenile court looks at "the family's condition not just when the case was filed, but also when it is heard." *In re S.D.*, 2 N.E.3d 1283, 1290 (Ind. 2014). As of the first day of the evidentiary hearing on June 12, 2018, the evidence reflected that Parents had already improved the condition of the home and were taking steps to provide better supervision to the Children, *i.e.*, Parents had completed

assessments and were participating in home-based case management, parenting education, drug screens, and visitations; all of Parents' drug screens had been negative; Father was participating in individual therapy and had been referred for medication management; visitation facilitators did not have any concerns regarding Parents' interactions with the Children during the visits; the supervision level of visits decreased to "drop-ins"; and M.T. had been referred to individual therapy, had completed a Hartford House interview, and a GLASS evaluation was being arranged.

[19] By the second day of the evidentiary hearing on July 25, 2018, FCM Goltz testified that Parents were fully engaged in services and had made significant improvements towards the condition of the home. FCM Goltz also testified that, although the Children's physical conditions *were* impaired at the time of removal, she no longer had concerns about Parents' ability to care for the Children and did not believe that coercive intervention of the court was necessary for child M.T. to continue receiving whatever services might be necessary. As for M.T.'s previous, troubling behaviors, FCM Goltz indicated that she had not witnessed any and that none had been reported to her. FCM Goltz recommended that the case go to an IA, an opinion shared by CASA Fricke. DCS does not dispute any of this evidence of progress, and we see no reason to disagree with the parties' assessment that the juvenile court failed to give it sufficient consideration. In light of the undisputed evidence of Parents'

progress and DCS's concession that the juvenile court erred, we reverse the juvenile court's adjudication that the Children are CHINS.[3]

[20] The judgment of the juvenile court is reversed, and we remand with instructions to accept the proposed IA.

Bailey, J., and Brown, J., concur.

---

[3] Because we conclude that the juvenile court erroneously adjudicated the Children to be CHINS, we need not address Mother' challenge to the services ordered in the dispositional decree.