## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Mar 14 2019, 8:42 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of M.R. and T.L. (Children in Need of Services) | March 14, 2019 |
| | Court of Appeals Case No. 18A-JC-2076 |
| A.R. (Mother), | Appeal from the Allen Superior Court |
| *Appellant-Respondent,* | |
| v. | The Honorable Charles F. Pratt, Judge |
| | The Honorable Sherry A. Hartzler, Magistrate |
| The Indiana Department of Child Services, | Trial Court Cause Nos. 02D08-1712-JC-758 02D08-1712-JC-759 |
| *Appellee-Petitioner.* | |

**Bailey, Judge.**

# Case Summary

A.R. ("Mother") appeals the trial court's order adjudicating M.R., aged sixteen, and T.L., aged thirteen, ("Children") as Children in Need of Services ("CHINS"), upon the petition of the Allen County Department of Child Services ("DCS"). Mother presents a single issue: whether the CHINS determination is clearly erroneous. We affirm.

# Facts and Procedural History

On December 7, 2017, Fort Wayne Police Officer Christopher Brautzsch ("Officer Brautzsch") was dispatched to Mother's residence in response to a 9-1-1 call from M.R.'s boyfriend, K.J., reporting that Mother had battered M.R. Although M.R. and K.J. maintained a relationship, K.J. was subject to a protection order forbidding him from contacting Mother or M.R.

K.J. met Officer Brautzsch outside the residence. Mother answered the door and began yelling vulgarities, insisting that the police leave, and threatening K.J. that he was going to "end [up] dead" for seeing M.R. and threatening Mother. (Tr. Vol. III, pg. 8.)

Officer Brautzsch attempted to speak with Children but Mother stood between the officer and her daughters. Officer Brautzsch asked if Children were okay, and each nodded in response. However, M.R. broke down in tears and Mother "shut the door in [the officer's] face." *Id.* at 9. Officer Brautzsch persisted, threatened forced entry, and eventually entered the house through a back door.

He could see that M.R. had a cut inside her mouth and it appeared to be a fresh cut. According to Officer Brautzsch, Mother was behaving toward both the police and K.J. in a manner that was "angry," "hostile," and "vulgar." *Id.* at 10. Mother was handcuffed and placed on the sofa so that officers could conduct their investigation and interview M.R. in private.

[5] M.R. reported to officers that Mother had become very angry about M.R. seeing K.J. at their mutual workplace and then bringing home a backpack containing K.J.'s shoes. M.R. alleged that she and Mother had struggled over the backpack, Mother ordered the younger sibling, T.L., to get a knife to cut the backpack strap, and Mother had then taken the knife and stabbed the backpack. Unable to wrest the backpack away from M.R., Mother grabbed M.R.'s hair, repeatedly struck her in the face, and sat on her. M.R. complained to Mother that she could not breathe, and Mother responded "[she] didn't care." *Id.* at 25. M.R. stated that she was able to escape to her bedroom and text K.J. to get help.

[6] Mother was arrested, and Children were placed in relative care. T.L. returned to Mother's home a few days later, while M.R. remained in relative placement.

[7] Evidence was heard at a fact-finding hearing conducted on March 21 and March 22, 2018. Mother testified and denied that her disagreements with M.R. had been anything other than verbal. In contrast, M.R. testified that Mother had struck and injured her on December 7, 2017, and she also described a physical altercation one or two weeks earlier. Finally, she described an incident

where Mother had confronted S.R., the relative with whom M.R. had been placed. M.R. testified that Mother followed her out after a counseling session, blocked in S.R.'s vehicle with her own, and then used her fist to strike S.R.'s vehicle on the window and door.

[8] S.R. testified to the same incident, adding that Mother threatened her by saying, "bitch you better watch your back." *Id.* at 44. M.R. was crying and shaking while Mother shouted obscenities. S.R. believed that Mother had become enraged because she wanted DCS to place M.R. with her maternal grandmother as opposed to S.R. The grandparent placement was eventually arranged but, in the meantime, communications between M.R. and Mother were problematic. S.R. testified that Mother telephoned M.R. from various phone numbers, and would direct loud vulgarities toward M.R. and S.R. S.R. also testified that she saw texts from Mother to M.R., blaming M.R. for their circumstances, and that Mother inappropriately focused upon M.R.'s entitlement to Social Security benefits from her father's death.

[9] Visitation supervisor Paige Walker testified that she had supervised four visits between Mother and M.R. and had recommended that the visits be changed to therapeutic visits. The basis for her recommendation was that Mother could become very angry, she had expressed suspicion that she would be slandered or "lied about" in visitation notes, and she brought up M.R.'s Social Security benefits excessively. *Id.* at 64. Mother testified in response that M.R. told lies and "the State" had "lied several times." *Id.* at 87. Mother reiterated that she did not engage in either physical or verbal aggression.

[10] On May 29, 2018, the trial court entered its findings, conclusions, and order. Among the factual findings were specific findings that: Mother struck and injured M.R., Mother ordered T.L. to retrieve a knife and stabbed a backpack while M.R. was holding it, T.L. witnessed M.R.'s struggle to breathe, Mother attacked S.R. and made threats, and "Mother cannot control her anger and provide for a stable home free of verbal and physical violence." Appealed Order at 3. The court concluded that both children were neglected due to the domestic violence and that M.R.'s physical health was seriously endangered. The court acknowledged that M.R. had been involved in two years of counseling (following her father's death) but further observed that M.R. reported she was not being heard and she had requested additional services. The trial court concluded that Children needed services directed toward the prevention of domestic violence that they were unlikely to receive without coercive intervention and adjudicated Children as CHINS.

[11] Mother appeals, asserting that Children are now both in her care and the fact-finding order should be reversed to "avoid the stigma and negative implication of a CHINS finding." Appellant's Brief at 10.

# Discussion and Decision

## Standard of Review

[12] A CHINS proceeding is a civil action, and thus the State must prove by a preponderance of the evidence that a child is a CHINS. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010) (citing Ind. Code § 31-34-12-3). In reviewing a CHINS

adjudication, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). We consider only the evidence that supports the court's decision and the reasonable inferences drawn therefrom. *Id.* We will reverse only upon a showing that the trial court's decision was clearly erroneous. *Id.*

[13] Where, as here, the trial court has entered *sua sponte* findings of fact and conclusions thereon,[1] our review is governed by Indiana Trial Rule 52(A). *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). As to issues covered by the findings, we apply a two-tiered standard of review: first we consider whether the evidence supports the factual findings, and then whether those findings support the court's judgment. *Id.* We review the remaining issues under the general judgment standard where we will affirm the judgment if it can be sustained on any legal theory supported by the evidence. *Id.*

## Adjudication of Children as CHINS

[14] For the trial court to adjudicate a child a CHINS, DCS must prove three elements: (1) the child is under the age of eighteen; (2) one of eleven statutory circumstances (codified in Indiana Code Sections 31-34-1-1 to -11) exist that would make the child a CHINS; and (3) the child needs care, treatment, or rehabilitation that he or she is not receiving and that is unlikely to be provided

---

[1] The CHINS statutes do not require that findings of fact and conclusions thereon be entered as part of a CHINS fact-finding order. Here, neither party made a written request for Trial Rule 52 findings and conclusions.

or accepted without the coercive intervention of the court. *In re K.D.*, 962 N.E.2d at 1253 (citing *In re N.E.*, 919 N.E.2d at 105). DCS alleged that Children were CHINS under Section 31-34-1-1, the general neglect provision, which states:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

I.C. § 31-34-1-1.

[15] DCS also alleged that M.R. was a CHINS pursuant to Indiana Code Section 31-34-1-2(b), which provides in relevant part:

> A child is a child in need of services if, before the child becomes eighteen (18) years of age, the child:
>
> (1) is a victim of … an offense under IC 35-42-2-1 [battery]; and

> (2) needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
>
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[16] The trial court found that both children were CHINS under the general neglect statute and that M.R. was a CHINS because she had been a victim of battery.

[17] Not every endangered child is a CHINS, permitting the State's *parens patriae* intrusion into private family life. *In re S.D.*, 2 N.E.3d at 1287. The proper focus is upon the best interests of the child and whether the child needs help that the parent will not be willing or able to provide – not whether the parent is guilty or deserving of a CHINS adjudication. *Id.* at 1285.

[18] A CHINS adjudication under the general neglect provision "requires three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *Id.* at 1287. The coercive intervention prong exists to protect families from unnecessary state intrusion. *Id.* A CHINS finding should consider the family's condition when the case was filed, but also when the case is heard. *Id.* at 1290.

[19] Mother denies that M.R. was a victim of battery and that she enlisted T.L.'s help. Mother also denies that DCS established that Children's needs are unlikely to be met without State coercion.

[20] M.R. testified that Mother battered her and caused injuries consisting of a "busted lip" and red marks from slaps. (Tr. Vol. III, pg. 29.) She also testified that Mother directed her younger sibling to bring a knife to Mother. T.L. was witness to her mother using the knife in M.R.'s vicinity, striking M.R., and impeding M.R.'s efforts to breathe. Multiple witnesses described events indicating that Mother was openly angry and hostile toward those trying to assist her. The responding police officer found Mother to be "angry, hostile, and vulgar" and described her efforts to keep officers from directly communicating with Children. (Tr. Vol. III, pg. 10.) The relative caregiver testified that she was confined, threatened, and cursed. The visitation supervisor described Mother as erupting in anger and expressing suspicions that she would be unfairly portrayed in visitation notes. In sum, there is evidence that Mother battered M.R. in T.L.'s presence and generally opposed assistance. Upon this evidence, the trial court properly concluded that coercion was needed to cause Mother to deal with her anger that had erupted in domestic violence.

[21] Mother observes that M.R. had continuously been in family counseling since the death of her father and this was not court-ordered. However, Mother makes no claim that the counseling sessions have ever addressed Mother's perpetration of domestic violence or verbal opposition to service providers. Indeed, a major premise of Mother's appellate arguments is her denial that she initiated or participated in any family violence. She does not attack any finding of fact as lacking evidentiary support. Rather, Mother simply requests that we

reweigh the evidence that was before the trial court and re-assess the credibility of M.R. We cannot do so. *In re K.D.*, 962 N.E.2d at 1253.

[22] Mother alternatively suggests that our review of the adjudication should include consideration of her uncontested claim that Children are both in her physical custody. Mother takes the position that, even if State intervention was needed at one time, it is now unnecessary, and we should reverse the trial court so that Mother can avoid stigma or future collateral consequences. She identifies no authority for the proposition that an appellate court reviews a CHINS adjudication in hindsight with the benefit of post-adjudication events. The evidence supports the trial court's findings of fact and the findings of fact support the CHINS adjudication. Mother cannot obtain reversal on grounds that a CHINS adjudication may have future consequences.

# Conclusion

[23] The order adjudicating Children as CHINS is not clearly erroneous.

[24] Affirmed.

Bradford, J., and Brown, J., concur.