ATTORNEY FOR APPELLANT
Amy Karozos
Greenwood, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

Patrick M. Rhodes
Marion County Department of Child Services
Indianapolis, Indiana

_____

# In the
# Indiana Supreme Court

FILED

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

_____

No. 49S05-1309-JC-585

IN THE MATTER OF S.D., ALLEGED TO BE
A CHILD IN NEED OF SERVICES

J.B.,

*Appellant (Respondent),*

v.

INDIANA DEPARTMENT OF CHILD SERVICES,

*Appellee (Petitioner).*

_____

Appeal from the Marion Superior Court, Juvenile Division, No. 49D09-1205-JC-19222
The Honorable Marilyn Moores, Judge
The Honorable Diana Burleson, Magistrate

_____

On Petition to Transfer from the Indiana Court of Appeals, No. 49A05-1209-JC-488

_____

**February 12, 2014**

**Rush, Justice.**

Child in need of services (CHINS) cases aim to help families in crisis—to protect children, not punish parents. Our focus, then, is on the best interests of the child and whether the *child* needs help that the parent will not be willing or able to provide—not whether the *parent* is somehow

"guilty" or "deserves" a CHINS adjudication. But that help comes not by invitation, but compulsion—imposing the court's "coercive intervention" into family life. And a CHINS adjudication may have long-lasting collateral consequences for the family. The intrusion of a CHINS judgment, then, must be reserved for families who *cannot* meet those needs without coercion—not those who merely have *difficulty* doing so.

Here, the evidence reflects that Mother had difficulty meeting the demands of a situation that would test the mettle of any parent—but not that she would be unable to correct her one lingering issue without the "coercive intervention of the court." DCS's desire to help this struggling family was understandable, but the facts simply do not justify subjecting this family to State compulsion. We therefore reverse the trial court.

## Facts and Procedural History

This CHINS case stems from Mother's struggles in abruptly relocating to a new city to meet the challenges of a toddler's serious medical crisis, while still providing for four other children. On March 26, 2012, Mother took two-year-old S.D. to an emergency room in Gary because of rapid respirations. The emergency room transferred S.D. to a hospital in South Bend, where she went into cardiac arrest as a result of a previously undiagnosed cardiomyopathy. S.D. was then transferred to Riley Hospital for Children in Indianapolis, where S.D. was given a tracheostomy[1] and gastrostomy,[2] and placed on a ventilator.

Initially, S.D.'s four siblings remained with relatives in Gary while Mother remained at the hospital with S.D., where she was actively involved in S.D.'s care. But during the older siblings' spring break in early April, Mother abandoned the family's rental home and belongings in Gary—leaving everything behind and moving the whole family to Indianapolis to be near S.D. For several weeks, the family's housing was transient, and Mother struggled to meet the whole family's needs—

---

[1]  A tracheostomy is surgery to create an opening through the neck into the windpipe to provide an unobstructed airway. National Institutes of Health, <u>Tracheostomy</u>, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/002955.htm (last visited Feb. 12, 2014).

[2]  A gastrostomy tube is a feeding tube placed directly into the stomach through an incision in the abdomen. National Institutes of Health, <u>Feeding tube insertion – gastrostomy</u>, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/002937.htm (last visited Feb. 12, 2014).

failing to enroll S.D.'s school-aged siblings in Indianapolis schools, becoming disengaged from S.D.'s care plan, and spending less time with S.D.

At that point, Mother admitted she had become "overwhelmed" by the situation, and consented to DCS removing the other four children from her care to let her focus on S.D.'s treatment, "without having to worry about the housing and the childcare, and the food, and everything else that she wasn't able to maintain . . . with limited resources." Accordingly, DCS took custody of the children in early May and initiated CHINS proceedings over all five of them, based on S.D.'s special medical needs and Mother's lack of steady housing and other needs for the children.

By the time of the fact-finding hearing, Mother had moved into a three-bedroom duplex and renovated it adequately for the family to live in—and S.D.'s siblings had been returned to her care several weeks before the fact-finding hearing. Additionally, S.D. no longer required the ventilator, but Riley's hospital policy would not permit her to be released to Mother's care until Mother and a second caregiver completed significant medical training to care for S.D.'s tracheostomy at home. However, Mother struggled to find a second caregiver and had not finished the final step of the necessary medical training. And finally, Mother had largely spurned DCS's help in identifying sources of social assistance and locating job opportunities, relying instead on financial help from family and pursuing a job lead she had found on her own, and was still unemployed as of the hearing.

At the fact-finding hearing, DCS's position was that while Mother "has done a lot and she has done her best," she had also "received a lot of help and she still needs a lot of help" because (1) S.D. still could not come home without the 24-hour training completed, (2) Mother's ongoing ability to pay rent remained uncertain, and (3) she had not shown an ability to navigate social assistance programs without caseworkers' help. By contrast, Mother's position was that she had needed help when she first moved to Indianapolis, but had also "been very resourceful on [her] own" and chosen not to rely on government assistance while family support was available—so that "everything [they] have here" she had "done on [her] own." Accordingly, Mother reasoned that none of the children were still in need of services.

As to S.D.'s siblings, the trial court agreed with Mother, concluding that even though she "did not have stable housing at the time of the filing of the petition," she "obtained housing and is providing for the children as of the time of the fact-finding." The court therefore released wardship

and closed the case as to those children. But the court did find S.D. in need of services because no one in the home had "completed the medical training needed" to meet her "special medical needs." Mother appealed.

In an unpublished decision, the Court of Appeals affirmed. In re S.D., No. 49A05-1209-JC-488 (Ind. Ct. App. May 29, 2013). Like the trial court, the Court of Appeals recognized that "Mother made great strides in preparing for S.D.'s return to her custody," but "neither [she] nor the recently selected second caregiver had completed the medical training required by Riley to address S.D.'s complex medical needs," despite having known for several months that the training was a prerequisite to S.D. returning home. Slip op. at 4–5. The Court of Appeals concluded that even though the failure to complete that training was largely because of Mother's "geographic and economic limitations," that failure was nevertheless "sufficient to show that the necessary care was unlikely to be provided without the intervention of the trial court." Slip op. at 5.

We granted Mother's petition to transfer, 993 N.E.2d 625 (Ind. 2013) (table), thus vacating the Court of Appeals opinion, see Ind. Appellate Rule 58(A). As explained below, we now reverse the trial court. Additional facts will be supplied as necessary.

**Standard of Review**

In reviewing a trial court's determination that a child is in need of services, "[w]e neither reweigh the evidence nor judge the credibility of the witnesses." In re K.D., 962 N.E.2d 1249, 1253 (Ind. 2012) (citing Egly v. Blackford Cty. Dept. of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). Instead, "[w]e consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom." Id.

Here, the trial court entered abbreviated findings and conclusions sua sponte. (Unlike CHINS dispositional decrees, see Ind. Code § 31-34-19-10 (2008), no statute expressly requires formal findings in a CHINS fact-finding order; nor did either party request them under Indiana Trial Rule 52(A).) As to the issues covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment. Yanoff v. Muncy, 688 N.E.2d 1259, 1262 (Ind. 1997). But we review the remaining issues under the general judgment standard, under which a judgment "will be affirmed if it can be sustained on any legal theory supported by the evidence." Id. (internal quotation marks omitted).

4

**Discussion and Decision**

**I. Did Mother Require the Court's Coercive Intervention?**

*A. Statutory Elements of a "CHINS 1" Action.*

Not every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family. See generally In re K.D., 962 N.E.2d at 1255. Rather, a CHINS adjudication under Indiana Code section 31-34-1-1 (often called a "CHINS 1," in reference to the section number) requires three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion. In full, the statute provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) *is unlikely to be provided or accepted without the coercive intervention of the court.*

I.C. § 31-34-1-1 (2008) (emphasis added). That final element guards against unwarranted State interference in family life, reserving that intrusion for families "where parents lack the *ability* to provide for their children," not merely where they "encounter *difficulty* in meeting a child's needs." Lake Cnty. Div. of Family & Children Servs. v. Charlton, 631 N.E.2d 526, 528 (Ind. Ct. App. 1994).

*B. Trial Court's Sua Sponte Findings.*

The trial court found that DCS had failed to make that showing as to S.D.'s siblings because Mother "ha[d] obtained housing and [was] providing for the children as of the time of the fact-finding [hearing]," thus addressing the concerns that were the basis for the petitions as to them. Its contrary decision as to S.D. rested solely on her special medical needs and Mother's incomplete training to address those needs:

The Court shows that DCS has met their burden to show that [S.D.] is a child in need of servies [*sic*], given the medical needs and amount of trainig [*sic*] that is still outstanding before she can return to the home to the care of mother.

\* \* \*

The Court does find [S.D.] to be a child in need of services as the child has special medical needs that neither [Mother] nor [Father] are able to meet at this time. Neither individual has completed the medical training needed for the child's care and based on this, the child would be endangered in either parents' [*sic*] care.

Those findings, though sparse, adequately address the first two CHINS 1 elements under Indiana Code section 31-34-1-1(1) and (2)(A). They reflect the trial court's recognition that S.D. had "special medical needs" and that her parents were not yet able to meet those needs—which, in turn, sufficiently implies that S.D. would be endangered because of the parents' inability to provide the medical services she needed.

### C. Evidence on Matters Beyond the Findings.

The findings are wholly silent, however, as to (2)(B)'s critical determination—whether the care that S.D. needed (that is, the final medical training Mother needed to complete) was "unlikely to be provided or accepted without the coercive intervention of the court." We cannot say the absence of such a vital finding is error, because no statute requires special findings in a CHINS fact-finding order, nor did any party move for such findings under Indiana Trial Rule 52(A). Nevertheless, findings even as minimal as those discussed above are very helpful to our review, and we recommend that trial courts' best practice would be to enter findings on each necessary element.

But without findings to review on the element of "coercive intervention," we instead examine the whole record under the general judgment standard, considering only the evidence favorable to the trial court's judgment. Yanoff, 688 N.E.2d at 1262. Accordingly, our review of whether coercive intervention was required as to S.D. must also account for the court's judgment that S.D.'s siblings were *not* in need of services, since we should review the court's judgment as a coherent whole and not in isolated or inconsistent fragments. And when we view the evidence in that light, we can conclude only that Mother had difficulty finishing her medical training—not that she was unlikely to finish it without the court's compulsion.

We begin with the court's rejection of DCS's claim that S.D.'s siblings were CHINS. When the CHINS petitions were first filed, Mother had not enrolled the children in school—having been

6

unsure where to enroll them until their housing stabilized. But though she was slow in making that decision, she had not disregarded its importance. And though she had needed stable housing, she obtained it shortly after the petitions were filed, finding an unfurnished three-bedroom duplex in need of significant renovation, then moving in and performing the renovations while the children were in DCS's care. She located the home and furnished it on her own, with little to no help from DCS being needed. Finally, despite Mother's continued unemployment, the trial court apparently did not share DCS's concern for her ability to be resourceful enough to maintain housing for the family. To the contrary, the other four children were provisionally returned to her care in early July, several weeks before the fact-finding hearing. Mother's diligence on those matters supports her assertion that she had "been very resourceful on [her] own"—that is, without the State's coercion.

In view of those determinations, the evidence favorable to finding S.D. to be in need of services is limited to two small points and one larger matter. There is some evidence that Mother had difficulty establishing priorities—on one occasion, her work on the house interfered with S.D.'s care when she stayed up late painting, then overslept and missed the sleep study that determined S.D. no longer needed the ventilator. Similarly, Mother delayed several weeks in obtaining a State-issued identification card that she needed for a job application, only going to the BMV when a DCS caseworker drove her there.

Second, there was some indication that Mother might not comply voluntarily with DCS's services. She refused to apply for a Postal Service job DCS identified, choosing instead to pursue a hospitality and catering position (yet failing to obtain the ID she needed for her application). Moreover, she rejected DCS's urging to apply for rent assistance from the township trustee—and even cancelled an appointment DCS had made on her behalf for that purpose—because she had instead paid her bills with support from friends and family.

Finally, there was evidence that Mother had perhaps been less than diligent in attending to S.D.'s care. By late May, S.D. had been weaned off the ventilator and transferred to a rehabilitation unit at Riley—but she still had a tracheostomy, which required extensive training for proper care. Riley's hospital policy therefore would not permit S.D. to be released home to Mother until both she and a backup caregiver took two classes at Riley, followed by a 24-hour practice session at the hospital to simulate the home-care environment. Mother struggled to find a DCS approved second caregiver. S.D.'s grandmother had moved to Indianapolis to live with the family for that purpose,

7

but her background check was not approved by DCS. Not until a few days before the CHINS fact-finding hearing did Mother identify an acceptable alternate caregiver, a family friend who moved from Gary at Mother's request for that purpose. From early on, Mother had learned how to administer medication through S.D.'s gastrostomy tube; and both Mother and the other caretaker finished the two classroom sessions of tracheostomy training. But because of the friend's work schedule, Mother had still not scheduled either of them for the 24-hour home-care training by the fact-finding hearing—even though that was the only unfulfilled requirement before Riley would let S.D. come home, and Mother had long known of that requirement.

Yet we believe that any reasonable view of those facts must also account for Mother's larger situation—an impoverished single mother of five, who was forced to abruptly uproot and relocate to a new city to tend to her toddler's life-threatening illness, while continuing to provide for her other children. Either the relocation or the medical crisis, standing alone, would seriously strain any parent. Yet even though some of Mother's decisions were questionable, we cannot say that she was less effective under duress than any other similarly situated parent of a special-needs child—and we are unwilling to say that every special-needs child of a low-income parent is necessarily "in need of services."

Rather, Mother's most significant failure—to complete the home-care simulation—appears as much a *product of* DCS's intervention as it is a sign of her *need for* that intervention. Mother's initial plan had been for Grandmother to serve as the secondary caregiver, and it was only because of DCS's disapproval that Mother had to go "back to the drawing board" to recruit someone else to fill that role. She did not do so until a few days before the fact-finding hearing, but did so nevertheless. In sum, she was still one step away from S.D. returning home—but *only* one step, and one in which the delay was at least partly a matter of DCS's own doing.

That evidence, even viewed most favorably to the judgment, cannot reasonably support an inference that Mother was likely to need the court's *coercive intervention* to finish the home-care simulation. A CHINS finding should consider the family's condition not just when the case was filed, but also when it is heard. In re C.S., 863 N.E.2d 413, 418 (Ind. Ct. App. 2007), trans. denied, abrogated on other grounds by In re N.E., 919 N.E.2d 102, 105–06 (Ind. 2010). And here, Mother had resolved the issues involving S.D.'s siblings by the time of the hearing and completed all but the final step necessary for S.D.'s return home. Her approach to solving those problems was at

times fitful or idiosyncratic—but it worked, as demonstrated by the siblings' return home weeks before the fact-finding hearing, and the court's eventual rejection of the CHINS allegations as to them. And though the State's intervention *enabled* some of her progress, such as the ability to renovate the house while the children were out of her care, none of the State's actions *compelled* her accomplishments. Though the evidence shows she had difficulty completing the last step of medical training, we cannot say she was unwilling or unable to do so without the court's compulsion, see Charlton, 631 N.E.2d at 528—and so the State's coercive intervention into the family cannot stand.

## II. Is This Appeal Moot?

After we granted transfer in this case, DCS moved to dismiss this appeal, alleging it is moot because S.D. has been returned to Mother's care, the CHINS case has been closed, and no effective relief can be granted. Mother disagrees, emphasizing that a CHINS finding can have harmful collateral consequences for the parent, and that reversal would grant Mother real relief from those consequences. We agree with Mother.

Foremost, a CHINS finding can relax the State's burden for terminating parental rights. Under Indiana Code section 31-35-2-4(b)(2)(B)(iii) (Supp. 2013), the State may terminate parental rights if a child has been adjudicated CHINS on two prior occasions, without proving either that the conditions resulting in a child's removal will not be remedied or that continuing the parent-child relationship threatens the child's well-being. And a prior CHINS finding may have adverse job consequences as well, such as precluding Mother from employment with any DCS contractor. See generally Ind. Dept. of Child Servs., Ind. Child Welfare Policy Manual § 13.4 (2013), available at http://www.in.gov/dcs/files/13.4_Evaluation_of_Background_Checks_for_DCS_Contractors.pdf. Similarly, a CHINS finding may preclude her from become a licensed foster parent. Id. at § 13.10, available at http://www.in.gov/dcs/files/13_10_Evaluating_Background_Checks_for_Foster_Family_Licensing.pdf. Reversal cannot change the efforts Mother expended in complying with the CHINS case, but it still affords her meaningful relief by lifting those collateral burdens. We therefore decline to find the case moot.

## Conclusion

S.D. and her siblings were legitimately in need of services when DCS filed its petitions. But by the fact-finding hearing, Mother had voluntarily addressed all but one of those concerns to the

trial court's satisfaction. In view of that judgment, the remaining evidence fails to show that Mother was likely to need the court's coercive intervention to complete that final item—and when that coercion is not necessary, the State may not intrude into a family's life. We therefore reverse the trial court's judgment that S.D. was a child in need of services.

Dickson, C.J., Rucker, David, and Massa, J.J., concur.