# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 15 2016, 11:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Isabella H. Bravo
Monroe County Public Defender's Office
Bloomington, Indiana

Karen E. Wrenbeck
Monroe County Public Defender's Office
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of Jo.K. and L.K. (Minor Children in Need of Services),

Ja.K. (Mother) and L.K. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

November 15, 2016

Court of Appeals Case No. 53A04-1603-JC-711

Appeal from the Monroe Circuit Court

The Honorable Stephen R. Galvin, Judge

Trial Court Cause Nos. 53C07-1508-JC-491 and 53C07-1508-JC-492

**Najam, Judge.**

## Statement of the Case

Ja.K. ("Mother") and L.K. ("Father") (collectively "the Parents") appeal the juvenile court's order finding their children Jo.K. and L.K. ("the Children") to be children in need of services ("CHINS"). The Parents present a single issue for our review, namely, whether the evidence is sufficient to support the CHINS adjudications. We affirm.

## Facts and Procedural History

L.K. was born on May 21, 2004, and Jo.K. was born on July 12, 2005. The Children were living with the Parents in May 2015, when the Indiana Department of Child Services ("DCS") received a report that the Parents were abusing illegal drugs in the home. On May 7, DCS caseworker Gennifer Weisheit visited the Parents at their home to investigate, and, at one point, Mother "started yelling and threatening to beat people up and kick people's teeth out." Tr. at 12. The Parents refused to let Weisheit see their bedroom, and they refused to submit to drug screens. Weisheit also interviewed the Children at their school. At that time, L.K. was having serious behavioral problems at home and at school. For instance, L.K. had "slashed tires and thrown rocks in the trailer court" where they lived. *Id.* at 14. Weisheit talked to Father about having L.K. assessed for ADHD and seeking medical treatment for "recommendations to assist with his behaviors." *Id.* at 13. But the Parents did not seek any such medical treatment for L.K.

[3]     In August, Weisheit received a report alleging that the Parents were neglecting the Children. Accordingly, Weisheit interviewed the Parents, the Children, and school personnel. When Weisheit visited the Children's school, she found that L.K. had been placed in a specially-padded room by himself. Among the incidents at school in which L.K. had been involved, on one day in August, L.K. had "wrapped a piece of paper around some kind of hard object and threw it at a substitute teacher[.]" *Id.* at 31. School officials then placed L.K. inside the padded room, where he "struck one of the custodians . . . a couple of times" and kicked an assistant principal and tried to hit him with his fists. *Id.* Weisheit asked the Parents whether they had sought medical treatment for L.K.'s behavioral problems, as they had discussed in May. The Parents stated that "they did not want L.K. on medication" and that they did not believe that mental health counseling would help L.K. *Id.* at 14.

[4]     Mother admitted to Weisheit that she was using methamphetamine, which she got from Father, Xanax, and marijuana. Mother had also petitioned for a protective order against Father following alleged domestic abuse. In particular, Mother alleged that Father had "smashed" her cell phone and "carried her from the living room and put her in her bedroom on the bed." *Id.* at 9-10. When Weisheit talked to Father, he initially denied any drug abuse, but he eventually admitted to smoking marijuana. Father admitted that he was high on marijuana during a meeting with Weisheit. And Father told Weisheit that Mother had "destroyed the televisions in the home, burned his clothes, and called the police." *Id.* at 11.

On August 26, 2015, DCS established a safety plan, which the Parents violated on August 29. Accordingly, DCS removed the Children from the Parents' care and filed petitions alleging that the Children were CHINS. Following a factfinding hearing on December 17, the juvenile court issued the following findings and conclusions in support of its determination that the Children are CHINS:

> 2. On May 7, 2015, the Department of Child Services investigated an allegation of drug use in the [Parents'] home. [Mother] became angry during the investigation. She made threats to DCS caseworker Jennifer Weisheit. [The Parents] refused to allow Ms. Weisheit into their rooms. They refused to provide drug screens.
>
> 3. On May 27, 2015, [L.K.] was experiencing behavioral problems at school. He had also slashed tires in the trailer court where the family resides. Ms. Weisheit spoke to [Father] about [L.K.]'s behavior. She recommended that he take [L.K.] to the doctor for an assessment. The parents did not take [L.K.] to the doctor. They did not want [L.K.] to be on medication. They did not think that counseling would help him.
>
> 4. On August 15, 2015, [L.K.] became violent at school. He threw an object at a substitute teacher. He struck a custodian several times. He struck an assistant principal with his fist. He also kicked the assistant principal. The school resource officer had to intervene. [L.K.] was placed in a padded seclusion room for his own protection.
>
> 5. On or about August 25, 2015, the DCS caseworker spoke to [Mother] at a protective order hearing. [Mother] had filed for a protective order against [Father] because there had been domestic violence in the home. [Mother] stated that [Father] had smashed her cell phone and carried her from the living room to

her bed.  [Mother] also admitted to the recent use of methamphetamine, Xanax, and marijuana.  [Mother] stated that she obtained the methamphetamine from [Father].

6.      When questioned about domestic violence in the home, [Father] stated that [Mother] had destroyed the televisions in the home and burned his cloth[e]s.

7.      When interviewed, [L.K.] told Ms. Weisheit that his mother had put his dad's cloth[e]s on the grill and set them on fire.  He also stated that his mother destroyed the televisions.  He stated that his mother uses Suboxone and marijuana.

8.      [Jo.K.] told Ms. Weisheit that her mother uses Xanax for her nerves.  She stated that her father smokes marijuana which he keeps in his bedroom.  She also stated that her father sells marijuana in the home most days.  She sometimes sees 5 to 8 people come over and take out money for marijuana.  The Court accepts the children's statements as true.

9.      [Father] initially denied drug use.  However, on September 2, 2015, [Father] was clearly impaired during a meeting at the Department of Child Services.  He admitted to using marijuana.  With one exception, he has refused to take drug screens.

10.     The parents maintain that the children's statements made prior to removal are not credible because the children recanted most of these statements in a deposition given on November 13, 2015.  During the deposition, the children variously stated that they lied to Ms. Weisheit or that they did not make the statements attributed to them by Ms. Weisheit.  However, they did not provide adequate explanations for why they would lie or why Ms. Weisheit would invent statements that they did not make.  Further, the children's statements made prior to removal demonstrate an intimate knowledge of their parents' use and sale of controlled substances.  The statements are consistent with the parents' admitted use of controlled substances.

11.     Since his removal from his parents' home, [L.K.]'s behavior at school has drastically improved. He has had no behavioral problems.

12.     The parents use controlled substances in the home with the knowledge of their children. They refuse to participate in drug screens. [L.K.] has experienced extreme behavioral problems. The parents have refused to seek treatment for [L.K.]. [Mother] has burned [Father]'s clothing and smashed televisions in the home. [Father] smashed [Mother]'s cell phone. Clearly, the coercive intervention of the court is necessary to ensure the health and safety of the children.

Appellant's App. at 114-16. This appeal ensued.

# Discussion and Decision

[6]     The Parents contend that the evidence is insufficient to support the trial court's determination that the Children are CHINS. Our supreme court has explained the nature of a CHINS proceeding and appellate review of a CHINS determination as follows:

> A CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.R.*, 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only upon a showing that the decision of the trial court was clearly erroneous. *Id.*

> There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.R.*, 919 N.E.2d at 105.

*S.S. v. Ind. Dep't of Child Servs. (In re K.D.)*, 962 N.E.2d 1249, 1253-54 (Ind. 2012) (footnote omitted).

[7] Here, the juvenile court issued findings and conclusions sua sponte. Therefore, as to the issues covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment. *J.B. v. Ind. Dep't of Child Servs. (In re S.D.)*, 2 N.E.3d 1283, 1287 (Ind. 2014). But we review the remaining issues under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.*

[8] DCS alleged that the Children are CHINS pursuant to Indiana Code Section 31-34-1-1, which provides as follows:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the

child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Our supreme court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287.

[9] Here, the Parents contend that the evidence is insufficient to prove either that: (1) the Children's mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the parents to supply the Children with necessary food, clothing, shelter, medical care, education, or supervision; or (2) the Children need care, treatment, or rehabilitation that is unlikely to be provided or accepted without the coercive intervention of the court. We cannot agree.

[10] As DCS correctly points out, the Parents do not challenge the juvenile court's findings of fact. Rather, the Parents maintain that: L.K.'s mental condition was not seriously impaired or seriously endangered because of the Parents' "decision not to put [L.K.] on medication"; there was no evidence that L.K.'s

behavioral problems "are attributable" to them; there was no evidence of a failure to supervise; there was no evidence that any domestic violence between the Parents occurred in the children's presence; there was no evidence that the Parents' drug abuse affected the children's necessary care, rehabilitation, or treatment; and their refusal to fully comply with services is not sufficient to prove that the Children are CHINS. Mother's Br. at 13-14.

[11] The Parents' contentions on appeal amount to a request that we reweigh the evidence, which we will not do. Again, the juvenile court found that: L.K. has exhibited significant behavioral problems at home and at school, and the Parents have refused to seek medical treatment, including behavioral therapy, in an attempt to resolve those problems; the Children were aware of the domestic abuse between the Parents; the Children were aware of the Parents' substance abuse and Father's marijuana dealing in the home; Father has refused to submit to all but one requested drug screen; and L.K.'s behavior has improved dramatically since his removal from the Parents' care. Those findings of fact support a determination that the Parents' actions or inactions have seriously endangered the Children, that the Children's needs are unmet, and that those needs are unlikely to be met without the coercive intervention of the State. *See In re S.D.*, 2 N.E.3d at 1287. We hold that the evidence is sufficient to support the juvenile court's adjudication of the Children as CHINS.

[12] Affirmed.

Vaidik, C.J., and Baker, J., concur.