## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 18 2019, 9:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT –
FATHER

Danielle Sheff
Sheff Law Office
Indianapolis, Indiana

ATTORNEY FOR APPELLANT –
MOTHER

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of A.W. (Minor Child), Child Alleged to be a Child in Need of Services;

J.W. (Mother) and J.B. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

April 18, 2019

Court of Appeals Case No.
18A-JC-2762

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Jennifer J. Hubartt, Magistrate

Trial Court Cause No.
49D09-1806-JC-1519

**Najam, Judge.**

## Statement of the Case

J.W. ("Mother") and J.B. ("Father") separately appeal the trial court's adjudication of their minor child, A.W. ("Child"), as a child in need of services ("CHINS"). Mother and Father each present a single issue for our review, which we consolidate and restate as whether the trial court erred when it adjudicated Child to be a CHINS.

We affirm.

## Facts and Procedural History

Mother has three children: C.W., born February 9, 2009; B.W., born March 26, 2012; and Child, born October 15, 2013, (collectively, "the Children"). Father, who is not married to Mother, is Child's father, but he is not the father of B.W. or C.W. On May 8, 2018, the Indiana Department of Child Services ("DCS") received a report that the Children, who were in Mother's care, were victims of neglect. Specifically, the report stated that Mother had been homeless since December and that she had been staying with Father, but that Father had kicked them out "due to domestic violence between the two." Father's App. Vol. II at 18.

DCS Family Case Manager ("FCM") Christi Carvajal went to Mother's residence to conduct an assessment of the Children. At that time, Mother was living at her mother's house. But Mother told FCM Carvajal that she could no

longer live there and that she was going to stay at a friend's house. Mother placed C.W. and B.W. with their father, and she placed Child with Father while Mother stayed with her friend. A few days later, Mother picked Child up from Father's house and took Child with her to stay at Mother's aunt's house.

[5] Thereafter, Mother told FCM Carvajal that she needed assistance finding a shelter for her and Child. FCM Carvajal attempted to find a shelter for Mother and Child, but the shelters were full. FCM Carvajal then contacted the Children's Bureau Family Support Center, which offered respite care for Child for the weekend. Mother declined the offer because she "didn't want to be away from her child on Mother's Day weekend." Tr. Vol. II at 29. FCM Carvajal then found a shelter for Mother, and Child continued to reside at Mother's aunt's house.

[6] Thereafter, on May 30, DCS received another report that Mother had been involved in multiple domestic violence incidents with Father. Specifically, the report indicated that, on May 26, Father had punched and kicked Mother in the face and stomach, which caused Mother to go to the emergency room. The report also indicated that Father had again hit Mother while they were at the hospital. The report further stated that, when Mother later went to Father's house to gather some of her things, Father "pulled a gun on her and [A.W.]." Father's App. Vol. II at 19.

[7] As a result of the second report, FCM Carvajal spoke with Mother on the phone. Mother informed FCM Carvajal that she no longer wanted to

participate in the assessment, and FCM Carvajal concluded the assessment. DCS had concerns regarding Mother's homelessness and instability for the Children. Accordingly, on June 1, DCS removed the Children from Mother's care and placed C.W. and B.W. with their father due to "them already being there," and, because Child was already with Mother's aunt, DCS "went ahead and left her there." Tr. Vol. II at 31. On June 4, DCS filed a petition in which it alleged that the Children were CHINS due to Mother's history of unstable housing and homelessness, Mother's refusal to accept and utilize resources, and the reports of domestic violence between Mother and Father. The trial court held a detention hearing on June 4. After the hearing, the trial court placed C.W. and B.W. with their father, and the court placed Child with Father on a trial basis contingent upon Father not allowing Mother to be at his residence. The court then ordered Mother not to go to Father's house.

[8] On August 17, Officer Nicholas Snow with the Indianapolis Metropolitan Police Department responded to a call near Father's residence in order to perform a welfare check on a woman. When Officer Snow arrived, he found Mother walking around the neighborhood. Officer Snow observed that Mother was "extremely distraught." *Id.* at 8. Officer Snow further observed that Mother's "face was swollen" and that it "looked like she had been in an altercation of some kind." *Id.* Mother told Officer Snow that she had been involved in a domestic violence incident with Father, who was her "live-in boyfriend." *Id.* Mother then informed Officer Snow of the type of vehicle that Father drives.

[9] After Officer Snow talked with Mother, he searched the area in an attempt to find Father. Officer Snow was able to locate Father's car, and he identified Father as the sole occupant of the vehicle. At that point, Officer Snow searched Father's vehicle and discovered a digital scale. Officer Snow then searched Father's home and found a plastic bat and some metal piping that Mother said had been used during the battery. He also discovered marijuana in plain view in one of the bedrooms. Officer Snow did not observe any of the Children in the car or in Father's house. Officers arrested Father and Mother.[1] Once Officer Snow detained Father, Father told Officer Snow that Mother was his girlfriend and that "she stays at the residence quite frequently." *Id.* at 13. As a result of Mother's and Father's arrests, DCS took Child into custody and placed her into foster care.

[10] Thereafter, DCS put referrals in place for Mother and Father to participate in home-based case work and for Mother to participate in home-based therapy. Additionally, "due to the alleged domestic violence incident," DCS also put in a referral for both Mother and Father to participate in a domestic violence assessment. *Id.* at 42. However, FCM Swygert had to put in new referrals for Mother to participate in home-based case work and home-based therapy because Mother "got hysterical with the providers and . . . fired them[.]" *Id.* at

---

[1] Mother and Father were both released a few hours later, and no charges were filed against them.

40. Further, Father's referrals were closed due to Father's failure to respond to providers. DCS did not recommend any services for B.W. and C.W.'s father.

[11] In mid-September, Mother told FCM Swygert that she had leased a house. Thereafter, Nikita King, a home-based case worker, went to Mother's home in order to conduct an inspection. When King entered the home, she observed that there was no stove, no refrigerator, no beds for the Children, no smoke detectors, and no food in the home.

[12] The trial court held a fact-finding hearing on the CHINS petition on September 24. During that hearing, DCS presented as evidence the testimony of Officer Snow, FCM Carvajal, FCM Swygert, and King. FCM Swygert testified that she had concerns with the Children living with Mother because Mother needed housing and financial security. She further testified that she had concerns with Child living with Father because Father had disregarded the trial court's order and allowed Mother to stay at his house. She also testified that she had concerns with both Mother and Father due to their history of domestic violence.

[13] King also testified at the fact-finding hearing. King testified that Mother "had requested that [they] stop Home Based Case work services" because "she could do it all on her own." *Id*. at 53. However, King further testified that, based on her observations of Mother's home a few days prior to the fact-finding hearing, the house was not safe or secure for minor children.

[14]    At the conclusion of the fact-finding hearing, the court adjudicated Child to be a CHINS, but the court found that C.W. and B.W. were not CHINS and placed them in the custody of their father. The trial court then entered findings of fact and conclusions thereon. Specifically, the trial court found as follows:

> 14. Mother told Officer Snow that she was in a physical altercation with [Father] on 8/17/18.
>
> * * *
>
> 26. Mother's testimony was not credible during the fact finding hearing when she denied that any domestic violence had ever occurred between she and [Father].
>
> * * *
>
> 32. [Father's] testimony was not credible during the fact finding hearing when he denied that any domestic violence had ever occurred between he and [M]other.
>
> * * *
>
> 48. Mother told FCM Swygert that she was homeless at the outset of the case. During the week of 9/17/18, [M]other told FCM Swygert that she had obtained housing. During the week of 9/17/18, the home based case manager did a home study at [M]other's home and noted that she did not have appliances, such as a refrigerator, in the home.
>
> 49. FCM Swygert had relayed to both [M]other and [Father] that DCS will provide a domestic violence assessment for both

[M]other and [Father], however, they have declined to participate in the same.

50.  FCM Swygert provided home based case management to [Father], however the service was unsuccessfully closed due to a lack of participation by [Father].

* * *

55.  Mother requested that Ms. King discontinue homebased case management because [M]other believed that she could access any services or concrete needs that she had on her own.

56.  Ms. King attempted to assist [M]other with employment and housing.  Mother lacked stable employment while Ms. King worked with her and started and ended several jobs in that time period.

* * *

59.  On 9/18/18, Ms. King observed [M]other's home to lack appliances, food, furnishings, and utilities and to be inadequate for the [C]hildren.

Father's App. Vol. II at 98-102.  Based on those findings, the trial court concluded that Child's physical or mental condition is seriously impaired or endangered "as a result of her parents' inability, refusal, or neglect to provide the child with a safe and stable home environment, free from exposure to domestic violence, and with adequate parental care and supervision."  *Id*. at 103.  The court further concluded that Child needs a safe and stable home environment, "which she is unlikely to receive without the coercive

intervention of the Court." *Id.* Thereafter, on October 22, the trial court issued its dispositional order in which it ordered both Mother and Father to participate in services. This appeal ensued.

# Discussion and Decision

[15] Mother and Father both contend that the trial court erred when it adjudicated Child to be a CHINS.[2] Our Supreme Court recently set out our standard of review:

> When reviewing a trial court's CHINS determination, we do not reweigh evidence or judge witness credibility. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). "Instead, we consider only the evidence that supports the trial court's decision and [the] reasonable inferences drawn therefrom." *Id.* at 1287 (citation, brackets, and internal quotation marks omitted). When a trial court supplements a CHINS judgment with findings of fact and conclusions law, we apply a two-tiered standard of review. We consider, first, "whether the evidence supports the findings" and, second, "whether the findings support the judgment." *Id.* (citation omitted). We will reverse a CHINS determination only if it was clearly erroneous. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). A decision is clearly erroneous if the record facts do not support the findings or "if it applies the wrong legal standard to properly found facts." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997) (citation omitted).

---

[2] On appeal, Father asserts that the trial court's findings 3, 8, and 20 are not supported by the evidence. And both Father and Mother assert that finding number 51 is not supported by the evidence. However, we conclude that those portions of the trial court's findings are immaterial to the court's judgment. Accordingly, we need not address whether any of those findings are supported by the evidence.

*Gr. J. v. Ind. Dep't. of Child Servs. (In re D.J.)*, 68 N.E.3d 574, 577-78 (Ind. 2017) (alterations in original).

[16] "A CHINS proceeding focuses on the best interests of the children, not the 'guilt or innocence' of either parent." *M.P. v. Ind. Dep't of Child Servs. (In re D.P.)*, 72 N.E.3d 976, 980 (Ind. Ct. App. 2017). "Because a CHINS determination regards the status of the child, a separate analysis as to each parent is not required in the CHINS determination stage." *N.L. v. Ind. Dep't of Child Servs. (In re N.E.)*, 919 N.E.2d 102, 106 (Ind. 2010). Indeed, "the conduct of one parent can be enough for a child to be adjudicated a CHINS." *Id*.

[17] DCS alleged that Child was a CHINS pursuant to Indiana Code Section 31-34-1-1 (2018), which provides that a child is a child in need of services if, before the child becomes eighteen years of age: (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court. Our Supreme Court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *J.B. v. Ind. Dep't. of Child. Serv. (In re S.D.)*, 2 N.E.3d 1283, 1287 (Ind. 2014).

[18]     In the present case, DCS alleged that Child is a CHINS due to issues of domestic violence between Mother and Father. On appeal, Mother contends that the trial court erred when it adjudicated Child a CHINS based on the domestic violence because "there was no evidence the parents engaged in any single act of domestic violence in the presence of [Child]." Mother's Br. at 24. Similarly, Father asserts that the trial court erred when it adjudicated Child a CHINS because Child was not present "during the incident when Mother and [Father] were arrested[.]" Father's Br. at 16. We must agree with both Mother and Father.

[19]     We acknowledge that "a child's exposure to domestic violence can support a CHINS finding." *In re D.P.* 72 N.E.3d at 984 (quotation marks omitted). However, where there is no evidence that domestic violence ever occurred in the child's presence, "there is no evidence as to the impact of the incident" on the child. *Id.* Here, the only evidence DCS presented at the fact-finding hearing regarding domestic violence between Mother and Father was evidence that Mother had reported to Officer Snow that Father had hit her on August 17. And the undisputed evidence demonstrates that Child was not present when the incident occurred. Because Child was not present, DCS did not present any evidence as to the actual impact, if any, of the incident on Child. While domestic violence is a serious issue, we cannot say that one instance of domestic violence between Mother and Father outside of Child's presence supports the trial court's determination that Child is a CHINS.

[20]     Still, in its Appellees' Briefs, DCS relies on information contained in the predispositional report to support its contention that Child is a CHINS due to multiple instances of domestic violence between Mother and Father. In the predispositional report, DCS indicated that it had received a report that indicated Father had hit and kicked Mother on several prior occasions, including once in the presence of Child. However, the claims in the report to DCS were merely allegations of domestic violence. DCS did not present any evidence at the fact-finding hearing to substantiate those claims or to otherwise demonstrate that Father and Mother had been involved in any other act of domestic violence apart from the August 17, 2018, instance. As discussed above, the only evidence DCS presented regarding domestic violence was the one instance in which Father hit Mother outside the presence of Child, which is not enough to support the CHINS adjudication.

[21]     However, DCS did not allege that Child is a CHINS only because of issues with domestic violence. DCS also alleged that Child was a CHINS based on Mother's homelessness, housing instability, and unsafe housing conditions. But, on appeal, Mother contends that the trial court erred when it adjudicated Child to be a CHINS based on her housing situation because, by the time of the fact-finding hearing, she had "obtained housing without the assistance of" DCS. Mother's Br. at 24. She further contends that, as of the date of the fact-finding hearing, her home had food, working appliances, and smoke detectors. And Father asserts that the trial court erred when it adjudicated Child a CHINS

because there was no evidence that Child was "adversely or negatively affected" by Mother's housing instability. Father's Br. at 16.

[22] But we must agree with DCS that the evidence most favorable to the trial court's judgment supports its conclusion that Mother's home was not a safe and stable environment for Child. Indeed, King testified that, as of the Tuesday before the fact-finding hearing, Mother's house had no stove, no refrigerator, no smoke detectors, no bed for Child, and no food in the home. Based on her observations, King testified that Mother's house was not a safe and secure place for minor children. Moreover, Mother does not dispute that, throughout the CHINS proceedings, she lacked housing stability. Because Mother's home was not safe for Child, we cannot say that the trial court erred when it found that Mother had not provided Child with a safe and stable home environment. Mother's and Father's contentions on appeal are simply requests for this court to reweigh the evidence, which we cannot do. *See In re D.J.*, 68 N.E.3d at 577.

[23] Still, Mother contends that, "[e]ven if this Court determines the findings were supported by the evidence, [DCS] did not prove Mother required the coercive intervention of the court." Mother's Br. at 27. To support that additional contention, Mother asserts that she "did not refuse to voluntarily participate in services offered" by DCS. *Id*. at 28. However, Mother's argument disregards the evidence most favorable to the trial court's judgment. During the fact-finding hearing, FCM Swygert testified that she had recommended home-based case work and home-based therapy services for Mother but that Mother had "fired" her services providers. Tr. Vol. II at 40. Additionally, King testified

that Mother stopped services because "she could do it all on her own." *Id.* at 53. Accordingly, contrary to Mother's assertions, the evidence indicates that Mother did not voluntarily participate in the services DCS had offered.

[24] The evidence most favorable to the trial court's judgment shows that Mother's house is not safe for Child and that Mother was not compliant with the services that could assist her. The evidence supports the trial court's findings that Mother's actions or inactions have seriously endangered the Child, that Child's needs are unmet, and that those needs are unlikely to be met without State coercion. *See In re S.D.*, 2 N.E.3d at 1287. And those findings support the trial court's judgment that Child is a CHINS. In light of the evidence most favorable to the judgment, we cannot say that the trial court's adjudication of Child as a CHINS is clearly erroneous.[3] We affirm the trial court's judgment.

[25] Affirmed.

Baker, J., and Robb, J., concur.

---

[3] In his reply brief, Father asserts that FCM Swygert's testimony "did not reveal that attempts had been made to determine whether [Father] could adequately parent" Child. Father's Reply Br. at 8. However, again, "[b]ecause a CHINS determination regards the status of the child, a separate analysis as to each parent is not required in the CHINS determination stage." *In re N.E.*, 919 N.E.2d at 106. Further, "the conduct of one parent can be enough for a child to be adjudicated a CHINS." *Id.* Accordingly, a separate analysis "as to" Father is not required, and the trial court's finding that Mother has an unsafe home supports its determination that Child is a CHINS.