# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision is not binding precedent for any court and may be cited only for persuasive value or to establish res judicata, collateral estoppel, or law of the case.

 

IN THE

# Court of Appeals of Indiana

In the Matter of: L.A.M, N.K.N., and B.L.N.
(Children in Need of Services),

B.U. (Custodian),

*Appellant-Respondent*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

---

August 27, 2024

Court of Appeals Case No.
24A-JC-407

Appeal from the Elkhart Juvenile Court

The Honorable Elizabeth A. Bellin, Magistrate

Trial Court Cause Nos.
20D06-2307-JC-90
20D06-2307-JC-91
20D06-2307-JC-92

**Memorandum Decision by Judge Brown**
Judges May and Pyle concur.

**Brown, Judge.**

[1] B.U. appeals from the trial court's dispositional order and claims the evidence did not establish that he is a custodian to L.A.M, N.K.N., and B.L.N. (the "Children"). We affirm.

**Facts and Procedural History**

[2] On July 18, 2023, the Indiana Department of Child Services ("DCS") filed petitions alleging the Children were children in need of services ("CHINS"). The petitions alleged D.N. ("Mother") was the Children's mother and stated: "That prior to the allegations contained in this petition, [B.U.] was living in the home of Mother, is in a relationship with Mother, and is allegedly the Father of Mother's unborn child. [B.U.] is the Custodian to the children." Appellant's Appendix Volume II at 47-48. DCS alleged that, on or about June 28, 2023, it received a report that L.A.M. and N.K.N. were victims of sex abuse and that B.U. was the perpetrator. N.K.N. disclosed that B.U. stated to her, "to do naked things," B.U. showed her pictures of "naked parts" and told her that he was going to do things to her, there were pictures on her sister's phone, she saw videos on her sister's phone that made her uncomfortable, and the videos and pictures came from B.U. *Id.* at 48. L.A.M. disclosed that B.U. "told her he was going to her [sic] private parts with his private parts," "showed her a video

and fondled her butt," asked her for a "booty pic," and showed her a pornographic website on his phone. *Id.* She also disclosed that B.U. "rubbed his private part all over her butt" and "she could feel his private part touching her as it was sticking up." *Id.* Also on July 18, 2023, the court held a hearing and issued an order placing the Children in protective custody. B.U. signed an advisement of rights on August 1, 2023. On September 27, 2023, the court held a hearing at which Mother admitted the Children were CHINS and B.U. denied the allegations in the petitions and requested an evidentiary hearing.

[3]     On December 11, 2023, the court held an evidentiary hearing. The following exchange occurred between B.U.'s counsel and the court:

> [Counsel]:   I have prepared a written Motion to Dismiss, um, it's just being brought up to the courthouse -- courtroom now. If Your Honor would be willing to hear that before the trial begins, um, --
>
> The Court:   We cannot wait, [Counsel.]
>
> [Counsel]:   I understand that, Your Honor.
>
> The Court:   -- it's 1:25.
>
> [Counsel]:   I understand.
>
> The Court:   Everyone's known about this trial for quite some time.
>
> [Counsel]:   That's -- that's fine, Your Honor. We're prepared.

Transcript Volume II at 68-69.

[4]     B.U. testified that he lived on Hudson Street in Elkhart and had lived at that address for less than six months. He indicated that, prior to living at that address, he "didn't have an address" and was "between friends' houses." *Id*. at 70. He indicated that Mother was the mother of his four-month-old child. He testified that he and Mother were engaged at one point and, with respect to the Children, "I was their guardian, I guess, is what I'd be called." *Id*. at 71. He stated that he lived with Mother "maybe July of '22 until the night this got brought to DCS's attention," and when asked "until June 28 of '23," he replied "Yep." *Id*. at 72. He indicated that, as of June 28, 2023, N.K.N. and B.L.N. lived in the home and he believed L.A.M. "was coming over on the weekends." *Id*. When asked "what type of care did you provide for the children," he responded, "just everyday things, cooking for him, [] picking him up from school, [] going outside and playing. Movies. Store runs, you know, just everyday stuff." *Id*. at 73-74. He indicated the most recent time he had seen Mother was "within a week probably, but it was in passing." *Id*. at 77.

[5]     On cross-examination, when asked, "for a while, you were . . . acting as father, stepfather, to these children," B.U. replied, "Every single day, day in and day out." *Id*. at 78. He indicated that the "allegations came to light," "the next morning, that's when police came and we was forced to separate," and "[t]hen [B.U.] moved out." *Id*. at 78-79. He stated, "I had my two dogs there, so, at times I would be there to let my dogs out, but it -- I was not living there, no." *Id*. at 79. He indicated that he had not lived with the Children since the end of

June. When asked "up until you moved out, . . . you were a custodian of the children," he answered, "Correct." *Id*. at 80.

[6] Mother testified that she did not have a current address and was staying between houses and that she did not stay with B.U.'s mother. She indicated she lived in Goshen when DCS became involved. When asked how often she saw B.U., Mother replied "I don't." *Id*. at 85. She stated "[w]e seen each other in passing a week ago." *Id*. When asked "did you and [B.U.] have an altercation recently," she replied, "No, I lied about that . . . [t]o get housing." *Id*. at 86. Mother indicated that she did not "intend to continue in a relationship with" B.U. and "that was always [her] opinion." *Id*. She indicated that her case manager told her that she needed to file a request for a protective order against B.U., that she had started one and planned to file it, and that, since June, she had not filed such a request. On cross-examination, Mother indicated that she had a child with B.U. who was born in August 2023, that B.U. saw their child, and that "he would message [her]" and she "would meet up with him and [they] would exchange her." *Id*. at 94.

[7] Family Case Manager Christina Eriks ("FCM Eriks") testified the case was assigned to her until July 21, 2023. She indicated that DCS received a report regarding the Children on June 28, 2023, and that the Children lived with Mother and B.U. in Goshen at the time of the report. When asked about Mother's future plans with B.U., FCM Eriks testified:

> [T]hat was kind of back and forth. We first started where he was being removed from the house. She was then concerned that he

resided at the house so she couldn't just kick him out of there. So, that kind of went a little bit back and forth for a couple days to where then he [] was moving into his mother's house [] so then it was just herself and him. And then she stated that there was nothing that could be done throughout the investigation that would make them split up. That she was having his child, and she didn't want another child that did not have the father . . . in their life.

*Id*. at 103. FCM Eriks testified, "I believe I spoke with [Mother] . . . and learned that [B.U.] was living with his mother." *Id*. at 106. She testified:

[Mother] went back and forth on if she [] believed the allegations. . . . There were multiple conversations of what her future plan was with [B.U.] being allowed back around the girls. At first, she did not want him around then it was nothing's going to stop us, we'll wait until the investigation is over to bring him back into the home.

*Id*. at 108. On cross-examination, when asked, "[d]uring the time that you [were] still involved, . . . [d]id you have any indication that there was any contact," FCM Eriks testified "Yes. . . . [Mother] and I had conversations [] that she was still very pregnant and was not able to do things around the house and that [B.U.] was coming over to the home to help do those things, such as lawncare, laundry, help take care of the dogs, whatnot." *Id*. at 110. On redirect examination, FCM Eriks indicated that, during the time of her involvement, B.U. was still involved with Mother and still coming over to her house and helping her.

[8]     Family Case Manager LaBrea Porter ("FCM Porter") testified that B.U. did not provide her with an address for where he was living but provided his mother's

address and "requested that that be used for mailing only." *Id*. at 119. She testified that, "[a]t first, [Mother] believed the children and what they were saying and then she changed her mind about like whether or not she believed them," and "she did let me know that she was still in communication with [B.U.] and that she was still seeing him and then once the follow-up happened for that, then she denied that." *Id*. at 122.

[9] Family Case Manager Miyuki Tabata ("FCM Tabata") testified that Mother did not want to provide her with an address for where she was living. When asked "[w]hat is your understanding of where Mother is living," she replied "Mother, well, the youngest child's placement stated that [] she's living with [B.U.] at his mother's house, but [Mother] stated that she lives in the motel." *Id*. at 126-127. She also indicated that the last time she asked B.U. for an address for where he was living, he did not want to provide her with that information.

[10] B.U.'s counsel argued "[t]he question is whether or not [B.U.] is still a part of this case" and that B.U. did not meet the definition of a custodian. *Id*. at 139. The trial court stated:

> Based on the facts and circumstances provided and in looking at [Ind. Code §] 31-9-2-31, [B.U.] falls squarely within the definition of custodian. Custodian for purposes of juvenile law means a person with whom a child resides. At the time of removal on June 28, [B.U.] lived with these children. [B.U.'s] own testimony was that he provided care for the children. He cooked for them, picked them [up] from school, played with them, did store and errand runs, everyday stuff that any parent, guardian, or custodian would do for

> these children. But for the removal and intervention of [DCS], that was the intervening cause.
>
> The fact that [B.U.] no longer resides with Mother is not the standard. The standard is a person with whom a child resides. At the time of removal, [B.U.] was residing with these children.

*Id*. at 141. The court found that the Children were CHINS.

[11] Following a dispositional hearing, the court issued a dispositional order which required B.U. to sign a release of information necessary for the CHINS case and services at the request of DCS, complete a parenting assessment and follow recommendations, complete a clinical assessment and follow recommendations, and participate in therapy that specializes in sexually maladaptive behavior.

**Discussion**

[12] B.U. asserts that the evidence does not support the trial court's findings and the conclusion that he is a custodian to the Children. He argues that, at the time of the evidentiary hearing, he was not involved in a relationship with Mother and was not in contact with the Children.

[13] As to issues covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings and whether the findings support the judgment. *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014), *reh'g denied*. We review the remaining issues under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id*. We do not reweigh the evidence or judge the credibility of

the witnesses. *Id*. We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.*

[14] Ind. Code § 31-9-2-31(a) provides, "'Custodian', for purposes of the juvenile law, means a person with whom a child resides." Ind. Code § 31-9-2-31(b) provides in part, "'Custodian', for purposes of IC 31-34-1, includes any person who is: . . . (5) an individual who has or intends to have direct contact, on a regular and continuing basis, with a child for whom the individual provides care and supervision." A child's custodian is a party to the proceedings described in the juvenile law. Ind. Code § 31-34-9-7.

[15] B.U. testified that he lived with Mother from July 2022 until June 28, 2023. There is no question that, during that time, B.U. had direct contact on a regular and continuing basis with the Children for whom he provided care and supervision. B.U. testified regarding the care he provided such as cooking, playing, and providing transportation, and he indicated that he was "acting as father, stepfather" to the Children "[e]very single day, day in and day out." Transcript Volume II at 78. B.U. further indicated that he moved out the morning after the "allegations came to light," and Mother indicated that she did not see B.U. and did not intend to continue in a relationship with him. *Id*. However, the court also heard testimony from FCM Eriks that, during her involvement in the case, B.U. was still involved with Mother and "was coming over to the home" to help with lawncare, laundry, and care for the dogs. *Id*. at 110. FCM Eriks further testified there were "multiple conversations of what [Mother's] future plan

was with [B.U.] being allowed back around the girls" and, "[a]t first, she did not want him around then it was nothing's going to stop us, we'll wait until the investigation is over to bring him back into the home." *Id.* at 108. She also testified that Mother "stated that there was nothing that could be done throughout the investigation that would make them split up." *Id.* at 103. FCM Porter and FCM Tabata testified that B.U. did provide them with an address where he was living, and FCM Tabata testified that "the youngest child's placement stated that [Mother was] living with [B.U.] at his mother's house[.]" *Id.* at 126-127. Mother testified that, although she was told that she needed to do so, she did not file a request for a protective order. We will not judge the credibility of the witnesses or weigh their testimony. The evidence and the reasonable inferences drawn therefrom support the trial court's judgment.

[16] For the foregoing reasons, we affirm the trial court.

[17] Affirmed.

May, J., and Pyle, J., concur.

ATTORNEY FOR APPELLANT

Nancy A. McCaslin
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General

Timothy M. Hamilton
Certified Legal Intern
Indianapolis, Indiana