# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 08 2020, 8:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Isabella Bravo
Monroe County Public Defender's Office
Bloomington, Indiana

ATTORNEY FOR APPELLEE

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of G.B., K.W., and D.C. (Minor Children), Children Alleged to be in Need of Services;

N.C. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

June 8, 2020

Court of Appeals Case No. 19A-JC-2435

Appeal from the Monroe Circuit Court

The Honorable Stephen R. Galvin, Judge

Trial Court Cause Nos.
53C07-1905-JC-276
53C07-1905-JC-277
53C07-1905-JC-278

**Najam, Judge.**

## Statement of the Case

N.C. ("Mother") appeals the trial court's adjudication of her three minor children, G.B., K.W., and D.C. (collectively, "the Children") as Children in Need of Services ("CHINS"). Mother raises a single issue for our review, namely, whether the trial court clearly erred when it adjudicated the Children to be CHINS.

We affirm.

## Facts and Procedural History

Mother is mother to three minor children: G.B., born December 14, 2002; K.W., born December 16, 2003; and D.C., born January 20, 2011. Mother is married to No.C., who is stepfather to Mother's three minor children ("Stepfather"). Mother has a long history of substance abuse, and her first contact with the Indiana Department of Child Services ("DCS") was in 2004, when Mother agreed to participate in a "Program of Informal Adjustment" with DCS, which required her to, among other things, consent to drug screens and undergo a substance abuse assessment. Ex. Vol. 3 at 117. In 2016, a juvenile court adjudicated D.C. to be a CHINS, and Mother successfully completed services in 2017.

In May 2018, DCS received a report alleging that Stepfather had physically abused D.C. In July 2018, DCS received a report that Mother and Stepfather (collectively "Parents") were neglecting D.C. and K.W. after Mother was arrested for stealing groceries from Kroger. And, in August 2018, DCS

received a report that Parents were neglecting all three Children, and DCS removed the Children from Parents' home. DCS filed petitions alleging that the Children were CHINS, but the juvenile court dismissed those petitions in November 2018. Parents agreed to participate in an informal adjustment.

[5] In May 2019, when Mother admitted to using methamphetamine on multiple occasions, DCS filed new petitions alleging that the Children were CHINS. Following a fact-finding hearing, the court found as follows:

> 3. [Mother] has a lengthy history of substance abuse and neglecting her children.
>
> 4. [Mother] participated in a Program of Informal Adjustment for [K.W.] beginning August 11, 2004. Mother and [her then-husband R.B.] both agreed not to become intoxicated on alcohol, illegal drugs, or prescription drugs, while caring for the children. They agreed to obtain a substance abuse assessment and participate in recommended treatment. They agreed to drug screens. They did not successfully complete the Informal Adjustment.
>
> 5. As noted in [G.B.]'s Clinical Interview and Assessment, both [G.B.] and [K.W.] were placed in guardianship with . . . [Mother]'s cousin from 2006 to 2018.
>
> 6. [D.C.], age 5, was detained from his [Mother] on June 20, 2016. . . . On July 28, 2016, [D.C.] was found to be a Child in Need of Services. . . .
>
> 7. A dispositional hearing was also held on September 1, 2016. [Mother] was ordered to complete a substance abuse assessment and follow all recommendations, participate in random drug screens, abstain from the use of drugs and alcohol, participate in

weekly home-based case management services, and complete a medication evaluation and follow all recommendations. Similar recommendations were made for [D.C.'s father] and [Stepfather].

8. [Mother] began Suboxone treatment in October 2016. As noted in the Review Hearing Order entered December 12, 2016, [Stepfather] continued to use methamphetamine, hydrocodone, oxycodone, and THC.

9. By May 2017, [Mother] and [Stepfather] were actively participating in a Suboxone program and complying with the dispositional orders. [Mother] was granted unsupervised parenting time with [D.C.]. The CHINS case was closed on November 6, 2017.

10. On July 3, 2018, [Mother] was arrested for stealing $750 worth of groceries. [Stepfather] was present in the parking lot when this occurred. At the time of her arrest, [Mother] became extremely upset, took a plastic fork, and began to stab her arms. Law enforcement placed handcuffs on her to stop her from harming herself. [Mother] then began to slam her head against the wall. After being placed in a patrol car, [Mother] continued to slam her head against the Plexiglas in the half-cage area. [Mother] later reported that she did not remember what had happened. She stated that she had relapsed and taken Xanax. She also took a high dose of Lemictal, her depression medication.

11. The Department of Child Services offered to provide services to the family through a Program of Informal Adjustment. [Mother] and [Stepfather] refused to participate voluntarily.

12. On August 15, 2018, petitions were filed alleging that [K.W.] and [D.C.] were Children in Need of Services.

13. On August 17, 2018, [Mother] threatened to burn down her home with the children in it rather than have the children

removed by the Department of Child Services. Following a hearing in the CHINS case, [Mother] struck [Stepfather] with her court papers outside the courtroom.

14. The CHINS petitions were dismissed by Judge Frances Hill on November 20, 2018, after [Mother] and [Stepfather] agreed to participate in a Program of Informal Adjustment. [G.B.] was also included in the Informal Adjustment. The Preliminary Inquiry states that on May 18, 2018, [D.C.] had a cigarette burn on his arm that [Stepfather] stated was accidentally inflicted.

15. [K.W.] and [G.B.] were under the care of a guardian until 2018. The first time [Mother] had custody of all three children was shortly before the signing of [the] Informal Adjustment.

16. Pursuant to the terms of the Informal Adjustment, [Mother] and [Stepfather] were again offered substance abuse treatment, random drug screens, home-based counseling, and intensive family preservation services—including Family Centered Therapy.

17. [Mother] and [Stepfather] began to participate in a Suboxone program. [Mother] tested positive for amphetamine and methamphetamine on December 10, 2018. Thereafter, she regularly tested positive for her prescription buprenorphine and THC. [Stepfather] also tested positive for amphetamine and methamphetamine on December 10 and December 14, 2018.

18. When confronted with the positive drug screens, [Mother] adamantly denied using. However, when [Stepfather] admitted to using methamphetamine, [Mother] also admitted [to using methamphetamine]. Although [Mother] and [Stepfather] both admitted to relapsing on methamphetamine, both gave different dates for their drug use. They gave six different dates for methamphetamine use in November and December. They stated

that the stress of having the children back in their home caused them to relapse.

19. [Mother] testified that she did not know what caused her relapse. However, she testified that she had never had [G.B.] before and it was too much for her. She testified that [G.B.] had many explosive days and he was physical with her.

20. [Stepfather] continued to use heroin. On February 20, 2019, [Mother] and [Stepfather] agreed to a Safety Plan that prohibited [Stepfather] from being alone with the children. On the same day, [Stepfather] violated the Safety Plan by leaving the home with [K.W.] While [Stepfather] and [K.W.] were out of the home, [Mother] left [D.C.] and [G.B.] alone downstairs while she remained upstairs.

21. While the children were left alone, [G.B.] sexually molested [D.C.] When [Stepfather] and [K.W.] returned home, they found both boys had their pants down. Both boys admitted that [G.B.] had asked [D.C.] to perform oral sex and he had complied. [D.C.] reported that [G.B.] had anally penetrated him. [G.B.] denies this.

22. During a Clinical Interview and Assessment on February 26, 2019, [Mother] admitted that she was aware that [G.B.] had been watching pornography that included incest, younger children, and "rough sex." She described ongoing physical aggression by [G.B.] against all members of the family, particularly his younger brother. [G.B.] sent his sister to the hospital after stomping on her stomach a few years ago. [G.B.] has been diagnosed with ADHD and disruptive mood dysregulation disorder. He takes medication for these diagnoses.

23. [Mother] was aware that [D.C.] has slashed tires with knives when left unsupervised. The school requires that [D.C.] be escorted to and from school due to behavioral issues. [Mother] knows that [D.C.] is a high needs child who requires supervision.

24.  [Mother] testified that she was not supervising the children because she was ill and that the children were only left alone for 15 minutes.  The Court does not accept this testimony as truthful.

25.  At the hospital, [Mother] and [Stepfather] both stated that their urine screens would be positive for marijuana.  [Mother] and [Stepfather] have continued to use marijuana.  [Mother] testified that using marijuana is risky for her sobriety.

26.  On May 8, 2019, [Mother] participated in an evaluation at Centerstone, the local mental health center.  [Mother] admitted to an extensive history of substance abuse, including the intravenous use of methamphetamine and heroin, abuse of Xanax, and use of opioid medications.  She was hospitalized at Valle Vista for substance abuse treatment in 2016.  She was diagnosed with schizoaffective disorder, bipolar type.  She has a history of manic episodes.  As a teen, she suffered auditory hallucinations that told her to harm herself.  She was hospitalized as a teen.  She has a history of suicidal thoughts and attempts, though none recently.  She was also diagnosed with PTSD and opioid use disorder, severe, in sustained remission; cannabis use disorder, moderate; and stimulant use disorder, mild.

27.  [Mother] had previously participated in a substance abuse evaluation at Centerstone on September 25, 2018.  At the time, she was diagnosed with schizoaffective disorder, bipolar type, and polysubstance use disorder, moderate.

28.  [Mother] and [Stepfather] continued to test positive for THC throughout the period of the Informal Adjustment.  [K.W.] regularly tested positive for THC throughout March 2019.  On May 16, 2019, the Program of Informal Adjustment was extended for an additional three months.

29.  In May 2019, [Mother] and [Stepfather] tested positive for methamphetamine.  [Mother] admitted to using methamphetamine on multiple occasions.  She stated that

[Stepfather] could not stop using because he was in pain from lupus. She admitted she shoots up methamphetamine. [Mother] stated that [Stepfather] is a trigger for her drug use.

30. [Mother] testified that [Stepfather] does not have a drug problem because he has not used methamphetamine since May. She does not believe his ongoing use of marijuana affects his sobriety.

31. On May 4, [Stepfather] was arrested at Kohl's with [K.W.]'s boyfriend.

32. On May 21, 2019, [Mother] had a large gash in her arm. She stated that she had flipped a table. [Mother] told her caseworker that she wanted to die every day.

33. The children were removed from their [Mother] and [Stepfather] on May 21, 2019.

34. As a result of the molestation, [G.B.] was placed at Gibault where he is receiving treatment for sexually maladaptive behavior. [Mother] admits that the children need therapy.

35. [K.W.] became pregnant at age 14. [Mother] told caseworker Rebecca Geiselman that she assumed [K.W.] was sexually active. [Mother] stated that she was not aware of the age of consent for sexual activity. Prior to learning the age of consent, [Mother] was fine with [K.W.] having a relationship with an older individual.

36. [Mother] testified that [K.W.] is mature and is a great mother at age 15. This characterization is unrealistic. [K.W.]'s baby was born positive for marijuana. The identity of the father is not known. [K.W.] has a history of self-harming behavior.

* * *

39. In light of the ongoing substance abuse by [Mother and Stepfather], the ongoing neglect of the children by all of their parents, and the children's extreme behavioral problems, the coercive intervention of the court is clearly necessary to ensure the safety of [G.B.], [K.W.], and [D.C.]

Appellant's App. Vol. 2 at 35-39. The court then adjudicated the Children to be CHINS and entered a dispositional order following a hearing. This appeal ensued.

# Discussion and Decision

[6] Mother asserts that the trial court clearly erred when it adjudicated the Children to be CHINS. As our Supreme Court has explained:

> In all CHINS proceedings, the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. When reviewing a CHINS adjudication, we do not reweigh evidence or judge witness credibility and will reverse a determination only if the decision was clearly erroneous. A decision is clearly erroneous if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts.

*V.B. v. Ind. Dep't of Child Servs.*, 124 N.E.3d 1201, 1208 (Ind. 2019) (citations and quotation marks omitted).

[7] DCS alleged that the Children were CHINS pursuant to Indiana Code Section 31-34-1-1, which provides that a child under the age of eighteen is a CHINS under the following circumstances:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

> (A) the child is not receiving; and

> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

As our Supreme Court has explained, "[t]hat final element guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the ability to provide for their children,' not merely where they 'encounter difficulty in meeting a child's needs.'" *J.B. v. Ind. Dep't of Child Servs. (In re S.D.)*, 2 N.E.3d 1283, 1287 (Ind. 2014) (quoting *Lake Cty. Div. of Fam. & Child. Servs. v. Charlton*, 631 N.E.2d 526, 528 (Ind. Ct. App. 1994)). When considering this requirement, "courts should consider the family's condition not just when the case was filed, but also when it is heard." *Gr. J. v. Ind. Dep't of Child Servs. (In re D.J.)*, 68 N.E.3d 574, 580 (Ind. 2017) (quotations omitted). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581.

[8] Mother does not challenge the juvenile court's finding that each of the Children's physical or mental condition is seriously endangered. Rather, her sole contention on appeal is that the intervention of the court is not required to coerce Mother to provide the care and treatment the Children need. In

particular, Mother maintains that, while she needed help with the Children previously, she has been recently "in compliance with services" and, therefore, "the need for coercive intervention is not ongoing." Appellant's Br. at 9, 11.

In support of her contention, Mother cites our Supreme Court's opinion in *In re D.J.*, 68 N.E.3d at 574. In that case, DCS filed petitions alleging that the children were CHINS after one of them almost drowned in a bathtub and DCS found deplorable conditions in the parents' home. Services provided to the parents included as follows: "parental psychological evaluations, drug screens, parenting curriculum, homemaker services (cleaning the home and keeping it clean), home-based individual and family therapy, unsupervised visitation for Father, and supervised visitation for Mother." *Id.* at 577. At the time of the fact-finding hearing on the CHINS petitions, "Parents had completed or were in the process of completing all services [DCS] required. [DCS] deferred family homemaker services because Parents had already cleaned the house, and the court deferred Father's psychological evaluation for unspecified reasons." *Id.* Still, the juvenile court found that the children were CHINS.

On appeal, our Supreme Court held that the juvenile court erred when it found that the children were CHINS. In particular, the Court observed that

> [t]he trial court's CHINS order included factual findings that
> amply support its conclusion that Parents required coercive
> intervention *early* in the CHINS process. But those findings did
> not show that Parents needed *ongoing* coercive intervention
> throughout the process, and they certainly did not show that
> Parents needed such intervention by the time of the fact-finding

hearing months later. To the contrary, the record shows that Parents eventually cooperated with the Department's services and had satisfactorily completed all services (except those deferred by the Department or the court) by the time of the fact-finding hearing.

*Id.* at 581 (emphasis original).

[11] Mother's reliance on *In re D.J.* is misplaced, as the facts are readily distinguishable from this case. Here, as DCS points out, Mother tested positive for methamphetamine in May 2019, just two months before the final hearing, and she admitted to smoking marijuana in June 2019. Given Mother's long history of substance abuse and mental illness, her continued substance abuse is compelling evidence that the coercive intervention of the court is necessary to ensure that the Children receive the care they need. Mother's attempt to minimize her continued substance abuse is not well taken. And her contentions on appeal amount to a request that we reweigh the evidence, which we will not do. The juvenile court's detailed findings are supported by the evidence and are more than adequate to establish that the family's need for court intervention to protect the Children is ongoing. In sum, we hold that DCS presented sufficient evidence to support the juvenile court's determination that the Children are CHINS.

[12] Affirmed.

Kirsch, J., and Brown, J., concur.