## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 22 2020, 10:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

C. Matthew Zentz
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekpa Talbot
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Matter of L.D., E.Z, and C.Z. (Minor Children) and B.Z. (Father),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,[1]<br><br>*Appellee-Petitioner.* | June 22, 2020<br><br>Court of Appeals Case No. 20A-JC-9<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Mark A. Jones, Judge<br><br>The Honorable Rosanne Ang, Magistrate<br><br>Trial Court Cause Nos. 49D15-1905-JC-1237 |

---

[1] DeDe K. Connor filed an appearance on behalf of Appellee-Guardian ad Litem, Child Advocates, Inc., but did not file a brief on appeal.

**Mathias, Judge.**

B.Z. ("Father") appeals the Marion Superior Court's order adjudicating his three minor children as Children In Need of Services ("CHINS"). B.Z. raises three arguments:

   I.   Whether the trial court abused its discretion when it admitted into evidence L.D.'s statements to the family case manager ("FCM");

  II.   Whether clear and convincing evidence supports the trial court's findings; and,

 III.   Whether the Department of Child Services ("DCS") proved by a preponderance of the evidence that the children are CHINS.

We affirm.

# Facts and Procedural History

In May 2019, law enforcement officers responded to a report of domestic violence at Father's home. Father fled the home before officers arrived. K.Z. ("Mother") was present with her three children, five-year-old L.D., four-year-old E.Z., and two-year-old C.Z. Father is L.D.'s stepfather and E.Z. and C.Z.'s biological father. L.D. told the officers that he saw Father choke Mother and put a knife to her throat.

[4] A DCS family case manager interviewed L.D. on May 10, 2019. L.D. stated that he did not feel safe in his home because Father is mean. He reported that Father is violent and "smacks" his siblings. Appellant's App. p. 21. The family case manager also spoke to E.Z. who told her that "Daddy smacks Mommy" and "Daddy is angry to Mommy." *Id*. E.Z. also stated that "daddy is a dragon." *Id.* The family case manager observed that two-year-old C.Z. was dirty and smelled of marijuana.

[5] Mother told the family case manager that Father is violent and held a knife to his own throat. She stated that Father struggles with bipolar disorder. Father admitted that he "has tried to slice his own neck open in front of the children." *Id*. He also admitted to using cocaine and marijuana. Both parents refused to do an instant drug screen.

[6] Both parents had prior unsubstantiated DCS history concerning a domestic violence allegation in June 2018. And Father had a prior substantiated DCS history for physical abuse against E.Z. Father slapped E.Z. when she woke Father up resulting in bruising to E.Z.'s face.

[7] As a result of DCS's investigation, the children were removed from Mother's and Father's care. On May 13, 2019, DCS filed a petition alleging that the children were CHINS as defined in Indiana Code section 31-34-1-1. DCS alleged that parents had not provided the children "with a safe, stable, and appropriate living environment free from substance abuse and domestic violence." *Id*. at 33.

[8] The initial hearing was held on May 14, 2019. Father appeared in person and by counsel. Mother appeared in person and requested appointed counsel. Both parents denied the allegations in the CHINS petition. The trial court ordered the continued removal of the children from parents' home and ordered supervised parenting time. The children were placed in relative care on or about June 6, 2019.

[9] On August 1, 2019, Mother admitted that the children were CHINS and waived her right to a fact-finding hearing.[2] Father continued to contest DCS's allegations. Father also argued that DCS obtained L.D.'s statement without parental permission, violating his Fourth Amendment rights. On August 8 and September 5, 2019, the trial court held child hearsay and fact-finding hearings.

[10] At the August 8 hearing, L.D. testified that he saw Father and Mother fight a "couple times." Tr. p. 55. He said he did not see Father hit Mother and was not afraid of his parents. *Id.* at 55–56. Father stated that he suffers from depression and he was planning to go to a doctor soon to get medication for his depression and anxiety. *Id.* at 59. Father admitted to using marijuana but stated he did so while he lived in Michigan and a doctor prescribed it for him. *Id.* at 59, 63. Father was not employed on the date of the hearing and had lost his home. Father planned to move into his mother's home.

---

[2] Mother actively participated in services provided by DCS. On October 7, 2019, the trial court issued an order allowing Mother unsupervised visitation and a temporary trial visit with the children.

[11]     The family case manager testified that Mother reported several incidents of domestic violence between herself and Father. *Id*. at 73. Father also admitted to the family case manager that he held a knife to his throat while the children were in the home. Father told the case manager that he used cocaine and marijuana. When the case manager interviewed Father, his behavior was erratic, and he was screaming for his mother. *Id*. at 75.

[12]     DCS made referrals for Father for supervised visitation, a domestic violence and substance abuse assessment, home-based case management and individual therapy. Prior to the August 8 hearing, Father had not participated in therapy. DCS did not believe that he was able to take care of the children on his own without his mother's assistance. *Id*. at 95. The family manager expressed the following concerns about Father's ability to care for the children:

> The kids don't have a home that's able to be maintained by either mother or father. I don't feel like his mental health issues have been addressed through therapy as well as case management has not progressed. I haven't seen accomplishments of any type of plan that's been set forth between the home-based case manager and [Father].

*Id.* at 96.

[13]     The guardian ad litem ("GAL") believed that there was an ongoing need for the Court's continued involvement with the family because of Father's mental health issues and domestic violence concerns that still needed to be addressed. Tr. pp. 116–17. The GAL also testified that L.D. told her that "he does not feel safe with his dad because his dad hurts his mom." Tr. p. 123.

[14] The home-based counselor testified that Father communicated and cooperated with her, and she was encouraging him to find employment. She also believed that Father would attend therapy on his own without court intervention. *Id.* at 88. The visitation supervisor testified that she did not observe any safety concerns during the visits between Father and the children. Tr. p. 144. She also stated that she had no concerns with Father living with the children in paternal grandmother's home. Tr. p. 145.

[15] Father's drug screens for the three weeks preceding the fact-finding hearing were negative. Father also filed a petition to dissolve his marriage to Mother.

[16] On October 4, 2019, the trial court adjudicated the children as CHINS. The trial court entered the following findings to support its adjudication:

> 6. In late-April or early-May of 2019 and while the children were present, [Father and Mother] were involved in an altercation which involved a knife.
>
> 7. At the time of DCS' assessment, [L.D.] indicated that [Father] held the knife to his mother's throat. [Father] indicates that he held the kitchen knife to his own throat during this altercation.
>
> 8. Immediately following the incident involving the knife, [Mother] took [L.D., E.Z., and C.Z.] to the home of a neighbor and contacted the police.
>
> 9. Jessica Janke, an assessment family case manager with the Department of Child Services, was assigned to assess the safety of the . . . children due to this incident.
>
> 10. During FCM Janke['s] interview of [Father], she observed his behavior to be erratic. [Father] was screaming and yelling for his mother.

11. At the time of DCS' assessment of the April/May incident, [L.D.] did not feel safe in his home due to [Father]. [L.D.] felt that his mother was only safe when she is at work, because she is safe from [Father] there.

12. [Father] has been physically abusive to [Mother] in the presence of the children. [Mother] told FCM Janke of several incidents of violence perpetrated by [Father] that were not reported to the police and [L.D.] has observed his mother and [Father] to "fight pretty much every day." [L.D.] provided some detail regarding the violence and stated that [Father] will "grab Mom's shirt and smack her." [L.D.] has also indicated that he "is supposed to call Nana on the [tablet] so that Nana can come get us when mom and dad fight."

13. [Father] has substantiated history with the Department of Child Services due to smacking [E.Z.] in the face when she was three years of age. [Father] was criminally charged for this incident.

14. [Father] struggles with depression and anxiety. When this action was filed, [Father] was using marijuana in an attempt to address his depression. [Father] also admitted to the use of cocaine to FCM Janke during her assessment.

15. On August 8, 2019, [Father] testified that he would be going to a doctor "soon" to get medication for depression and anxiety.

16. On September 5, 2019, [Father's] mother testified that [Father] had attended five or six appointments with a psychologist.

17. [Mother] and [Father] have intermittently maintained their relationship since this matter was filed.

18. [The children's] physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical

care, education, or supervision. According to [L.D.], [Father] held a knife to [Mother's] throat during an altercation in late-April or early-May. According to [Father], [Father] held a knife to his own throat during the altercation. The Court finds that the history of domestic violence in conjunction with either of these singular events places the children's physical and mental condition in danger. As the testimony of [L.D.] and Father did not conflict, the Court notes that both events could have occurred that evening. [Father] is physically abusive to [Mother] in the presence of the children. [Father] has been physically abusive to [E.Z.] in the past. [Father and Mother] have not completely ceased their relationship. [L.D.] does not feel safe in his home due to the actions of [Father]. [Father] needs mental health treatment that he did not begin to receive until after the first day of fact-finding in this matter. The totality of circumstances indicates that the home environment of the [] family is one of violence and untreated mental health, which places the children's physical and mental condition at risk.

19. [The children] need care, treatment, or rehabilitation that they are not receiving and is unlikely to be provided or accepted without the coercive intervention of the Court. Despite [Father's] struggle with depression and anxiety and his actions of self-harm, he did not seek treatment until four months after this matter was filed. The coercive intervention of the Court is necessary to compel [Father's] continued compliance in treatment.

Appealed Order pp. 1–2.

[17]     The court held a dispositional hearing and issued a parental participation order on October 31, 2019. Father now appeals.

# Standard of Review

[18] When a juvenile court makes findings in a CHINS case, our review is governed by Indiana Trial Rule 52, which states that "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A); *In re T.S.*, 906 N.E.2d 801, 804 (Ind. 2009). As to the issues covered by findings, we apply a two-tiered analysis, considering first whether the evidence supports the findings and then whether the findings support the judgment. T.R. 52(A); *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). Findings are clearly erroneous when there are no facts or inferences drawn therefrom that support them. *In re T.S.*, 906 N.E.2d at 804. A judgment is clearly erroneous if the findings do not support the juvenile court's conclusions or the conclusions do not support the resulting judgment. *Id.* We do not reweigh the evidence or judge the credibility of witnesses but view the evidence and its reasonable inferences most favorably to the judgment. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012).

## I. Admission of L.D.'s Statements

[19] Father argues that the trial court violated his due process rights when it admitted at the fact-finding hearing statements five-year-old L.D. made to the family case manager. Specifically, Father claims that the "trial court's decision to allow child hearsay statements [is] clearly erroneous as the child displayed no indication of reliability. The trial court's decision to allow child hearsay

statements gained by an impermissible interview is a violation of Father's due Process Rights." Appellant's Br. at 9.

[20] The Due Process Clause protects freedom of personal choice in family life matters. *In re T.H.*, 856 N.E.2d 1247, 1250 (Ind. Ct. App. 2006); *see also E.P. v. Marion Cty. Office of Family & Children*, 653 N.E.2d 1026, 1031 (Ind. Ct. App. 1995) ("Indeed, the courts of this state have long and consistently held that the right to raise one's children is essential, basic, more precious than property rights, and within the protection of the Fourteenth Amendment[.]"). This includes a parent's fundamental right to raise his or her child without undue interference by the state. *In re T.H.*, 856 N.E.2d at 1250. The right is not unlimited, however, and the State has the authority under its *parens patriae* power to intervene when parents neglect, abuse, or abandon their children. *Id.*

[21] In this case, the family case manager interviewed L.D. concerning the domestic violence occurring between L.D.'s parents in their home. The interview was authorized under Indiana Code section 31-33-8-7(b)(2). There is nothing in the record to suggest that Mother or Father objected to the family case manager's interview with L.D. or attempted to withhold consent to interview the child. Moreover, after reviewing the record, it is reasonable to infer that Mother allowed the family case manager to interview L.D.

[22] At the child hearsay hearing, Father argued that DCS did not request permission to interview L.D., violating his due process and Fourth Amendment rights. DCS argued that parental consent was not required due to exigent

circumstances of the domestic violence investigation. Tr. p. 10. The trial court rejected Father's argument. At the fact-finding hearing, Father objected to the admission of L.D.'s statements on hearsay grounds but did not raise his due process arguments. Tr. p. 48. In his brief, Father does not cite to pertinent authority or cogently argue that L.D.'s statements to the family case manager constitute inadmissible hearsay.

[23]     Father relies solely on *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003) and argues only that "[t]he statements relied upon by the court are a violation of Father's Due Process Rights and may not be used as the basis for a CHINS finding." Appellant's Br. at 12. *Heck* involved the Bureau of Milwaukee Child Welfare's investigation of corporal punishment against a third-grade student as a form of discipline at a private Christian school. During the investigation, a caseworker interviewed the child, who described the spankings and resulting injury and discussed possible injury to another student as a result of corporal punishment.

[24]     The caseworker decided to interview the second student, Doe, but did not notify Doe's parents that the caseworker intended to interview him. The caseworker believed she had statutory authority to interview Doe at his school without a court order or the consent of his parents or the school. *Id.* at 502. The school challenged the caseworker's authority to interview Doe without a court order. Local law enforcement agreed with the caseworker's assertion that she had authority to interview Doe, and the school eventually allowed Doe to be interviewed.

Doe's parents, individually and on behalf of Doe, filed a 42 U.S.C. § 1983 action against the caseworkers for violating their Fourth Amendment rights, right to familial relations, and due process rights. The Seventh Circuit concluded that the plaintiffs adequately alleged claims for illegal search, illegal seizure, and violation of the right to familial relations. Therefore, the court considered whether those deprivations occurred without due process of law. *Id.* at 526. Referencing the court's previous discussion concerning the caseworker's failure to follow the Bureau's policies for investigating claims of abuse, the court concluded that

> the plaintiffs have stated claims against the defendant for violating their right to procedural due process by: (1) failing to obtain a warrant or court order before searching Greendale's premises and seizing John Doe Jr.; (2) interrogating John Jr. without first notifying his parents and obtaining their consent; and (3) investigating the plaintiff parents for child abuse and threatening to remove the Does' children from their custody without definite and articulable evidence giving rise to a reasonable suspicion that the plaintiff parents had abused their children or that the children were in imminent danger of being abused.

*Id.* at 527.

*Heck* is legally, factually, and procedurally distinct from the circumstances in this case. Father does not support his citation to *Heck* with any reasoning as to why *Heck* supports his claim that his due process rights were violated when the trial court admitted L.D.'s statements into evidence. Because he failed to cite relevant authority and provide cogent reasoning to support any of his claims,

we conclude that Father has waived his challenge to the admission of L.D.'s statements at the fact-finding hearing. *See* Ind. Appellate Rule 46(A)(8)(a).

## II. Findings of Fact

[27] Father also contends that the following factual findings are not supported by the evidence: 1) that he and Mother have maintained a relationship since June 2019; 2) that the family home is one of violence; and 3) that Father did not seek mental health treatment until four months after the CHINS proceedings commenced.

[28] We agree that on the dates of the fact-finding hearing, Mother and Father were no longer involved in a romantic relationship. Mother moved out of the marital home at the beginning of June 2019, and Father filed for divorce in July 2019. It is possible that Mother and Father briefly reunited before Father filed for divorce, Tr. pp. 135–36, but there is nothing in the record to suggest that they maintained their relationship after the divorce petition was filed.

[29] But there was clear and convincing evidence to support the trial court's finding that the family home was a violent environment. Mother, L.D., and E.Z. all discussed domestic violence in the home with the family case managers. And Father admitted to the case manager that he held a knife to his neck while the children were present.

[30] There was also clear and convincing evidence to support the trial court's finding that Father did not seek mental health treatment for the first four months of these proceedings. DCS removed the children from Father's home in May.

Father admitted to mental health issues when the CHINS investigation began. The fact-finding hearing commenced on August 8, 2019. Father testified at that hearing that he had not received treatment but had an appointment scheduled with a doctor. When the fact-finding hearing concluded on September 5, 2019, Father's mother testified that Father had started treatment with a psychologist. Tr. pp. 134–35. This evidence supports the trial court's finding that Father did not seek mental health treatment for the first four months of these proceedings.

### III. Sufficient Evidence

[31]    Finally, Father argues that there is "no evidence that the children are in danger, that their needs are unmet, or that the coercive intervention of the court is necessary to protect them." Appellant's Br. at 10. It is well-settled that

> [i]n all CHINS proceedings, the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. When reviewing a CHINS adjudication, we do not reweigh evidence or judge witness credibility and will reverse a determination only if the decision was clearly erroneous. A decision is clearly erroneous if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts.

*V.B. v. Ind. Dep't of Child Servs.*, 124 N.E.3d 1201, 1208 (Ind. 2019) (citations and quotation marks omitted).

[32]    DCS alleged that the children were CHINS pursuant to Indiana Code section 31-34-1-1, which provides that a child under the age of eighteen is a CHINS under the following circumstances:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

[33] "That final element guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the ability to provide for their children,' not merely where they 'encounter difficulty in meeting a child's needs.'" *J.B. v. Ind. Dep't of Child Servs.*, 2 N.E.3d 1283, 1287 (Ind. 2014) (quoting *Lake Cty. Div. of Fam. & Child. Servs. v. Charlton*, 631 N.E.2d 526, 528 (Ind. Ct. App. 1994)). When considering this requirement, "courts should consider the family's condition not just when the case was filed, but also when it is heard." *Gr. J. v. Ind. Dep't of Child Servs.*, 68 N.E.3d 574, 580 (Ind. 2017) (quotations omitted). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581.

[34] One occurrence of domestic violence in a child's presence is sufficient to support a CHINS determination. *See In re D.P.*, 72 N.E.3d 976, 984 (Ind. Ct. App. 2017) ("[A] single incident of domestic violence in a child's presence may support a CHINS finding, and it need not necessarily be repetitive."). Mother described several incidents of domestic violence in the family home. Father has

a prior substantiated DCS history for physical abuse against E.Z., which also resulted in a felony conviction. L.D. and E.Z. stated that Father hits Mother. L.D. did not feel safe at home because of domestic violence. Father admitted that he held a knife to his throat in the children's presence and that he has mental health issues. The children are seriously endangered by the domestic violence in their home.

[35] Father argues that the coercive intervention of the court is no longer necessary because he and Mother are getting divorced. However, Father needs to address his mental health issues, and he had just started treatment for those issues in the days before the September 5, 2019, fact-finding hearing. Father does not acknowledge his physical abuse of the children and the effect that domestic violence has had on the children. Father has not demonstrated that he is no longer a danger to the children.

[36] Although there is some evidence supporting Father's argument that the children are not in need of services, it is not our role to reweigh the evidence and the credibility of the witnesses. *See In re K.D.*, 962 N.E.2d at 1253; *see also Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016) (explaining that appellate courts grant latitude and deference to trial courts in family law matters). Father has untreated mental health issues, has not addressed his substance abuse issues, and lacks understanding of the impact of domestic violence on his children. For all of these reasons, DCS proved by a preponderance of the evidence that the children are CHINS as defined in Indiana Code section 31-34-1-1.

# Conclusion

[37] Father has not established reversible error in the issues raised in this appeal. And DCS proved by a preponderance of the evidence that the children are CHINS. We therefore affirm the trial court's order adjudicating L.D., E.Z., and C.Z. as CHINS.

[38] Affirmed.

Riley, J., and Tavitas, J., concur.